NICHOLAS JANNES *et al.*, Plaintiffs-Appellants, *v.* MICROWAVE COMMUNICATIONS, INC., Defendant-Appellee.

(No. 57988;

First District (4th Division)—December 19, 1973.

Tasso H. Coin and Robert J. Tonos, and Daniel J. Leahy, of Conklin, Leahy & Eisenberg, all of Chicago (Charles A. Bane and Donald J. McLachlan, of Isham, Lincoln & Beale, of counsel), for appellants.

Reuben L. Hedlund and Alan I. Becker, of Chicago (Kirkland & Ellis, of counsel), for appellee.

Mr. JUSTICE JOHNSON delivered the opinion of the court:

This is an appeal from a suit brought to require specific performance of an agreement between the plaintiffs and the defendant for the sale of stock. A decree which denied the relief requested was entered following a trial by the court in equity without a jury. The issues presented for our review are whether the trial court erred in its construction of the agreement and whether the findings by the trial court are against the manifest weight of the evidence.

Microwave Communications, Inc. (hereinafter MCI) was incorporated

under the laws of Illinois in October, 1963, for the purpose of providing service as a common carrier for microwave communications between Chicago, Illinois, and St. Louis, Missouri. On December 31, 1963, MCI applied to the Federal Communications Commission (hereinafter FCC) for a construction permit for its microwave system. In February, 1966, the FCC designated MCI's applications for hearing to begin in early 1967. Among the issues specified for determination was whether the company was financially capable of constructing and operating the proposed microwave route.

During December, 1966, and January, 1967, the directors of MCI met several times to discuss methods of demonstrating financial responsibility to the FCC. In particular, they decided to create an escrow fund for investors. Under the terms of the escrow the invested funds would be segregated from the other affairs of the company and distributed to MCI only if the construction permit was granted by the FCC. Thus, the risk of loss to investors in the event MCI's application was denied would be eliminated. A fixed term of preferably one year was suggested so that, in the event the FCC failed to act within that time, depositors would be able to withdraw their money from the fund and MCI would be free to dissolve the escrow and consider alternate forms of financing.

One of the MCI stockholders who eventually became involved in the escrow was the plaintiff, Nicholas Jannes. Following negotiations between Jannes and Thomas Hermes, MCI's secretary-treasurer, an agreement was reached on March 3, 1967, pursuant to which Jannes and Jannes Associates, Inc. (hereinafter JAI), an Illinois corporation of which Jannes was president, committed $45,000 for investment in MCI. The agreement contemplated an immediate purchase by Jannes of 250 shares of common stock for $25,000 and a deposit by Jannes of $20,000 in the escrow for the purchase of 133⅓ shares of common stock at $150 per share provided the FCC ruled favorably on MCI's pending application.

At the March 3, 1967, meeting, Jannes asked to examine the form of the escrow pursuant to which the funds would be held. The escrow agreement which Jannes received later that day from the State National Bank of Evanston provided, in effect, that if the FCC issued the construction permit, the escrowee bank would deliver the deposits under the escrow to MCI; if the FCC denied the permit, the bank would return the funds to the depositors.

On March 6, 1967, following the review of the proposed escrow by his attorney, Jannes requested a confirmatory memorandum from Hermes for the purpose of having a written memorial of the terms of the agreement. Hermes immediately prepared a letter, dated March 6, 1967, which provided as follows:

"This will confirm our agreement and understanding. I have received from you, this date, on behalf of Microwave Communications, Inc., a check in the amount of $20,000.00 made out to Microwave Communications, Inc. Escrow Fund. This money will be deposited in the Escrow Fund under the terms of the agreement which will be received by you directly from the bank. In the event that the license or construction permit is granted to Microwave Communications by the FCC, the amount in the Escrow Fund, in your name, will be turned over to the corporation and at that time stock will be issued to you to cover the entire amount at the rate of $150.00 per share."

As contemplated by this letter, Jannes received the escrow agreement from the State National Bank of Evanston on or about March 9, 1967. This escrow was identical to the copy delivered Jannes on March 3, 1967, except that a new clause had been added which provided:

"[I]f no action has been taken by the FCC with respect to the aforesaid applications within 12 months from the date hereof, the Escrowee shall, after deducting its expenses and reasonable fee, return the balance of the Fund, plus increments thereto, to the Depositors as their respective interests may appear. Upon such return by the Escrowee, this agreement and the duties of the Escrowee hereunder shall terminate."

Jannes signed and returned to the bank a statement acknowledging receipt of the escrow agreement and agreeing to be bound by its terms. One week later, Hermes told Jannes that a one-year period for the escrow had been added at the request of the escrowee bank.

In October, 1967, an FCC hearing examiner authorized the issuance of a construction permit to MCI. However, MCI's opponents appealed this decision and it was stayed pending review by the full Commission.

In February, 1968, Jannes received a letter from MCI asking him to agree to an amendment of the escrow agreement which would extend his escrow deposit for an additional six months. The letter also stated:

"If your signed Agreement does not reach the Bank by March 3, 1968, the escrow will be terminated insofar as your participation is concerned and all rights of stock purchase thereunder will also be terminated."

Jannes told Hermes that he was uncertain about continuing in the escrow on two occasions. Nevertheless, Jannes signed amendments to the escrow agreeing to extend his participation in the fund for additional six-month periods in February, 1968 and August, 1968.

In February, 1969, before the expiration date of the escrow, the directors of MCI decided to allow the original escrow agreement to expire

and to offer a new form of escrow to the current depositors and others. Under the terms of the new escrow agreement, MCI would issue stock at $300 per share and the depositors would be permitted to maintain the same potential equity position that they held under the original escrow. Jannes declined MCI's invitation to become a depositor under the new escrow agreement and, upon expiration of the original escrow, plaintiffs' deposit of $20,000, with interest, was returned to them. Plaintiffs deposited the $20,000 in an escrow account at First National Bank of Chicago on terms substantially similar to those of the 1967 escrow.

On August 14, 1969, the FCC approved MCI's application for a construction permit. Plaintiffs then made a demand on MCI to issue 133⅓ shares of its common stock at $150 per share. MCI refused to issue the stock at that price and, on April 16, 1970, plaintiffs initiated an action seeking to compel specific performance.

The action below was brought and tried by the plaintiffs on the basis of an alleged oral agreement by MCI to issue 133⅓ shares of common stock to plaintiffs at $150 per share if and when the FCC ruled favorably on MCI's pending application, regardless of how long the FCC took to act. They argue that their agreement with MCI regarding the purchase of the stock was separate and distinct from the escrow agreement, which served merely as a repository of committed funds between the depositors and the bank. Plaintiffs further contend that, since MCI was not a party to the original agreement, the provision for termination at the end of 12 months was not binding on MCI and did not affect Hermes' oral agreement with Jannes.

On the other hand, defendant's position at trial was that the plaintiffs' right to the stock at that price terminated when the escrow expired. They argued that the agreement between the parties was contained in written documents and that the parol evidence rule prevented the adoption of the construction urged by the plaintiffs. According to the defendant, its agreement to issue the stock at $150 per share was governed by the terms of the escrow, which included a provision for termination at the end of 12 months.

The chancellor was very patient in allowing both sides to present all the evidence they had so that the court would be fully informed. After hearing the evidence and considering both the law and the equities, the chancellor found that plaintiffs' right to purchase the stock at $150 per share terminated with the expiration of the escrow.

The chancellor entered extensive findings which may be summarized as follows:

"(1) The key terms of the agreement were contained in written documents, specifically the March 6, 1967 letter from Hermes to

Jannes and the 1967 escrow agreement between the escrowee bank and the depositors;

(2) The parties intended these two written documents to be a final expression of their agreement and, since the terms expressed therein were explicit, unambiguous and unequivocal, they could not be contradicted by evidence of a prior or contemporaneous oral agreement;

(3) The terms of the escrow, which was the heart of the agreement, provided that the plaintiffs had a right to purchase stock if the FCC ruled favorably on MCI's application during the time the money was on deposit in the escrow in plaintiffs' name, and that the escrow would end in 12 months;

(4) Since the escrow was terminable after the time specified, MCI had the right to allow it to expire and propose a new agreement;

(5) MCI, although not a signatory, was a third party beneficiary bound to the terms of the escrow agreement because the escrow was intended and created for MCI's benefit. MCI was also bound to the terms of the escrow agreement by the signature of its secretary, Thomas J. Hermes, and by the essence and reason for the Escrow Agreement;

(6) Plaintiffs failed to show by a preponderance of the evidence that the terms of the parties' agreement, as set forth in the letter of March 6, 1967 and the Escrow Agreement, should be set aside or modified by reason of fraud or mistake; and

(7) Even if plaintiffs had the right to purchase the stock at $150 per share, their delay in attempting to vindicate their rights until after the FCC's favorable ruling disentitled them to the relief sought in equity."

Plaintiffs' first contention in this appeal is that the trial court erred in its construction of the agreement in two principal respects: (1) The chancellor's holding that the escrow was the "heart of the agreement" between the parties was erroneous as a matter of law, and (2) the chancellor's holding that the escrow embodied the final expression of the parties' understanding and agreement was improper and resulted in the failure to consider all other evidence on the ground that such other evidence constituted parol evidence.

We will consider initially the plaintiffs' argument that the escrow was not the "heart of the agreement." They contend that the chancellor's holding that no agreement would exist between the parties without the escrow totally lacks support in the record and is rejected by the terms of the escrow itself. In support of this contention, plaintiffs point out

that the escrow did not deal with MCI's obligations to issue stock or the plaintiffs' rights to acquire it but dealt only with the mutual obligations of the escrowee bank and the depositors.

After a careful review of the chancellor's entire findings, we think that the plaintiffs' focus upon the "heart of the agreement" language ignores the chancellor's repeated emphasis upon both the escrow and the March 6, 1967 letter as containing the key terms. In our view, a fair reading of the chancellor's holding is that both the March 6, 1967 letter and the original escrow agreement should be read together to determine the parties' agreement.

The chancellor found that the key terms of the agreement were contained in the March 6, 1967 letter given by Hermes to Jannes and the escrow agreement which it incorporated by reference. The letter of March 6, 1967 to Jannes stated that plaintiffs' investment of $20,000 would be "deposited in the Escrow Fund under the terms of the Escrow Agreement which will be received by you directly from the bank." One of the terms in the escrow agreement stated that the Escrowee shall return the escrow deposits and the agreement shall terminate if no action has been taken by the FCC with respect to MCI's application within 12 months.

■■ It is quite true that the escrow agreement did not specify the mutual obligations of the parties with regard to the stock. However, the March 6, 1967 letter given to Jannes by Hermes dealt specifically with MCI's obligation to issue the stock and plaintiffs' right to acquire it. That letter stated that the money held in plaintiffs' name in the escrow would be turned over to the corporation and stock issued at the rate of $150 per share if the FCC granted MCI's construction permit. Thus, the March 6, 1967 letter and the escrow agreement, when read together, reveal that the full extent of MCI's obligation was to issue MCI stock to plaintiffs at the rate of $150 per share if the FCC acted within 12 months of the parties' agreement. Otherwise, the escrow deposit would be returned and the stock obligation terminated.

Plaintiffs further urge that the chancellor erred in construing the agreement by holding that the escrow, whose terms were unambiguous, embodied the final expression of the parties' agreement. Plaintiffs argue that this holding was improper and resulted in the failure to consider all other evidence on the ground that such other evidence constituted parol evidence.

■■ The parol evidence rule is a rule of contract construction as well as an evidence rule. It provides that if the parties to an instrument intend that it alone is to constitute the agreement between them, or if the instrument itself is complete, terms not included in the instrument may

not be proved for the purpose of changing the contract. *Armstrong Paint Works v. Can Co.* (1922), 301 Ill. 102, 133 N.E. 711; *Weiland Tool & Manufacturing Co. v. Whitney* (1969), 44 Ill.2d 105, 251 N.E.2d 242.

The rationale for applying the parol evidence rule was explained by the court in *National Bank & Trust Co. v. Becker* (1962), 38 Ill.App.2d 307, 311, 187 N.E.2d 355, 357:

> "The rule is founded on the long experience that written evidence is so much more certain and accurate than that which rests in fleeting memory only, that it would be unsafe, when the parties have expressed the terms of their contract in writing, to admit weaker evidence to control and vary the stronger and to show that the parties intended a different contract from that expressed in the writing."

■■ Whether a particular subject of negotiation has been embodied by the writing depends wholly upon the intent of the parties. This intent must be sought in the conduct and language of the parties and the surrounding circumstances as well as the pertinent documents. 9 Wigmore *Evidence*, § 2430, at 98.

The chancellor found that both Jannes and Hermes intended the letter of March 6, 1967 and the escrow agreement incorporated therein by reference to express their final agreement as to termination of the agreement. He further found that the terms expressed in the documents were explicit, unambiguous and unequivocal. Moreover, the parties' intent was evidenced not only by the documents but by the parties' language and conduct and the surrounding circumstances.

We agree that neither the documents nor the surrounding circumstances in this case support plaintiffs' position that their right to purchase the stock at $150 per share was interminable. The March 6, 1967 letter clearly stated: "This will confirm our agreement and understanding." The clear import of that statement is that the purpose of the letter was to set forth all the terms to which the parties had agreed. Moreover, Jannes testified that his purpose in requesting the letter was to have a written memorial of the agreement.

The March 6, 1967 letter went on to state that the funds would be deposited in the escrow under the terms of the escrow agreement, and the agreement which Jannes signed contained a one-year termination provision. Although the initial escrow agreement given to Jannes did not contain the termination provision, we think that the surrounding circumstances clearly show that the parties intended to include the termination provision in their agreement. The chancellor found that Jannes' own testimony and conduct supported this view in the following respects:

> "1. While Jannes testified that he did not read the Escrow

Agreement that contained the termination agreement, his testimony in this regard was not convincing;

2. Jannes testified that a week after he signed the Escrow Agreement he was advised by Hermes that the bank had requested a one-year period for the escrow;

3. Jannes failed to object to the letter of MCI dated February 7, 1968, which asked him to amend the Escrow Agreement, extend his deposit, and advised him that failure to extend would terminate his right to purchase stock;

4. Jannes twice signed Amended Escrow Agreements which included termination provisions; and

5. Jannes twice warned Hermes that he was considering not extending his participation in the escrow."

The chancellor found additional evidence of the parties' intent to include the termination provision in their agreement from the surrounding circumstances. The trial court found that, since it was uncertain when the FCC would act upon MCI's application, MCI had insisted upon the termination provision so that it would be free to adopt a different financing plan if circumstances warranted. Moreover, there was uncontradicted testimony at the trial that the termination of original financial agreements and the substitution of new financing agreements is common in regard to FCC applications.

An almost identical suit for specific performance arising out of a similar investment in MCI was brought against the defendant in the United States District Court for the District of Massachusetts and, after a trial on the merits, judgment was entered in favor of MCI. (*Adler v. Microwave Communications, Inc.* (D. Mass. 1973), 353 F.Supp. 624.) The judgment in favor of MCI was unanimously affirmed by the United States Court of Appeals. *Adler v. Microwave Communications, Inc.*, No. 73-1058 (1st Cir., July 5, 1973).

Both Jannes and Alder claimed that, irrespective of the termination of the escrow agreement, MCI had orally agreed to issue the number of shares of MCI stock stated in the parties' writings at the price stated therein. The court in *Adler* concluded that the inclusion of an additional unwritten term which would in effect exempt plaintiff from the termination provision contained in the first escrow agreement was inherently unlikely under the circumstances of that case. The court stated:

"In reaching this determination, we particularly bear in mind the purposes which the escrow arrangement was designed to serve. As is clear from our discussion of the facts, the escrow agreement was created at least in part to accommodate Adler's unwillingness to make a straight risk-bearing investment in MCI.

That agreement was at the very heart of his relationship with the corporation; the escrow device served the dual function of enabling MCI to demonstrate financial capability to the FCC, and of allowing Adler to condition his investment upon the granting of the requested construction permits. In view of the centrality of the escrow agreement, we think it highly unlikely that the parties would have orally agreed that Adler's rights were to remain unaffected by its termination. It is noteworthy in this context that no alternative mechanism for the handling of Adler's funds in accordance with the above-described purposes has been suggested. Moreover, the implications of the termination provision, as amended, which mandated that the fund be returned to the depositors at the end of two years, were clear. In view of this fact, we think that reasonable men would not have agreed to so important a term as that alleged by Adler without committing it to writing."

■■ Intent, of course, is an issue of fact to be determined by the trier of fact. A reviewing court will not disturb the findings and judgment of the trial court where the determination of a case rests largely upon the facts if there is any evidence in the record to support the findings. (*Brown v. Zimmerman* (1959), 18 Ill.2d 94, 163 N.E.2d 518.) We hold that the evidence was more than sufficient to support the chancellor's finding that the parties intended the documents to express their final agreement as to the terms therein.

Finally, plaintiffs contend that the findings of the chancellor on the disputed issue of whether it was intended at the time the agreement was established that MCI's obligation would terminate before the FCC's ruling are against the clear weight of the evidence.

The central issue in this case is what was the duration of plaintiffs' right to purchase 133⅓ shares of MCI's common stock at $150 per share. We have already discussed our agreement with the chancellor's finding that the duration of the agreement was governed by the March 6, 1967 letter and the first escrow agreement, and that these documents were intended by the parties to be the final expression of their agreement. Under the terms of these documents, as buttressed by Jannes' own testimony and conduct, the original agreement was intended by both parties to last for 12 months. When the first 12-month period ended, both Jannes and MCI agreed to two extensions for six-month periods. However, at the expiration of the final extension, MCI exercised its right to allow the first escrow to expire and proposed a new escrow agreement.

Plaintiffs argue that key defense witnesses were impeached and their testimony was not convincing. Furthermore, plaintiffs assert that no

corporate intent or plan existed reserving the right to modify the agreement and, consequently, such an intent could not have been communicated to the plaintiffs and in fact was not. They claim that the purpose of the new escrow agreement which doubled the price at which JAI could receive the shares was not to satisfy MCI's alleged pressing need for funds, but rather to enable various insiders of MCI to acquire additional shares on extremely favorable terms.

■■ The credibility of witnesses and weight to be accorded their testimony is within the province of the trier of fact. (*Manley v. Geng* (1955), 7 Ill.App.2d 6, 128 N.E.2d 641; *Bauske v. City of Des Plaines* (1957), 13 Ill.2d 169, 148 N.E.2d 584.) The record shows that the chancellor scrupulously followed the testimony, frequently interjecting his own questions. After hearing all the evidence and observing the demeanor of the witnesses, the chancellor found that the plaintiffs had failed to prove their case. Where the trial court has seen and heard the witnesses and the testimony is contradictory, a reviewing court will not substitute its judgment for that of the trial court unless the findings are manifestly against the weight of the evidence. *Brown v. Zimmerman* (1959), 18 Ill.2d 94, 102, 163 N.E.2d 518.

The chancellor found that MCI had from the outset intended the escrow plan for financing to be terminable after one year, and we agree. The purpose of the termination provision was to give MCI the freedom to adopt a different financing plan if circumstances warranted within the designated time. It had not been necessary for MCI to adopt a different plan in 1968, so the original escrow agreement was simply extended twice. By 1969, however, MCI needed to raise additional funds, and this need was fulfilled by adopting the new escrow agreement.

Plaintiffs failed to prove at trial by a preponderance of the evidence that they were the victims of fraud perpetrated by insiders of MCI. Even if this allegation had been proved, it would not serve to vary the terms of the agreement as plaintiffs seek to do.

After reviewing the evidence, we hold that the chancellor's findings of fact and conclusions of law were correct. The escrow agreement dated March 3, 1967 and the letter dated March 6, 1967 constituted the final agreement of the parties.

The judgment of the circuit court of Cook County is affirmed.

Affirmed.

BURMAN, P. J., and ADESKO, J., concur.