ROBERT H. GRAEBE, Plaintiff-Appellee, *v.* WILLIAM F. GRAEBE, Defendant-Appellant.—(ROHO RESEARCH AND DEVELOPMENT, INC., Defendant-Appellee.)

Fifth District No. 80-150

Opinion filed April 30, 1981.

J. William Lucco, of Mudge, Riley & Lucco, of Edwardsville, for appellant.

Ray Freeark, of Freeark, Harvey & Mendillo, of Belleville, for appellee Robert H. Graebe.

Gundlach, Lee, Eggmann, Boyle & Roessler, of Belleville (Carl W. Lee and Gary K. Morgan, of counsel), for appellee Roho Research and Development, Inc.

Mr. JUSTICE HARRISON delivered the opinion of the court:

This appeal followed a suit for declaratory judgment initiated by Robert H. Graebe against his brother William F. Graebe, Jr., and against the family corporation, Roho Research and Development, Inc. The elder Graebe sought to invalidate a shareholders' agreement between himself and William which was executed on April 29, 1977. The circuit court of St. Clair County entered an order dated February 2, 1979, declaring that the approval of Robert's wife, Norma Jean Graebe, was a condition precedent to a valid agreement. Besides holding the agreement unenforceable on that ground, the court cited numerous other factors which rendered the contract void. William F. Graebe appeals from the circuit court's order. We affirm.

Roho was and is an Illinois corporation formed to manufacture balloon cushions for the prevention and relief of bedsores. A certificate of incorporation was filed on March 30, 1973, authorizing the issuance of 1000 shares of common stock. Robert Graebe, the only stock purchaser, bought stock certificate No. 1 for 510 shares at $10 per share. Officers of the corporation were elected: Robert Graebe, president; William Graebe, vice-president; and Robert's wife, Normal Jean, secretary-treasurer. They also served as directors of the corporation.

Robert Graebe, who developed the product which Roho manufactures, received a degree in electrical engineering from the University of Delaware in 1957. He was employed by All-American Engineering in Wilmington after graduation. There, while working with Dr. Arthur Heather at the DuPont Memorial Convalescent Hospital, he became aware of the bedsore problem. In 1962, Robert began working for McDonnel-Douglas Aircraft Corporation and in 1965 he was assigned by McDonnel to a subsidiary, Conductron. During this period, he spent his spare time designing a product he hoped would alleviate the pain and discomfort connected with bedsores. He began working in his basement and garage on the development of a flotation device. He negotiated a patent exclusion contract with Conductron in 1966 and, by 1968, made his first application for patent. This was eventually granted to him in 1971.

The defendant, his brother William, participated from time to time in the early stages of the project, usually by loaning equipment. William earned an associate degree from Belleville Junior College in 1959, a BA in marketing from Southern Illinois University in 1964, and a master's degree in marketing management from Southern Illinois University in 1970. From 1968 to 1972, William was assistant to the vice-president of Emerson Electric. After leaving Emerson, he worked briefly on his own, and then

went to work for Intertherm as assistant merchandising and advertising manager. He was laid off in March of 1974 and thereafter went to work exclusively for Roho. Having already established contacts with the future distributors of the product that his brother was developing, he cultivated these contacts and enabled Roho to share booths with them at national medical supply conventions. With Robert's help, William designed the Roho slide presentation used at the exhibits. The alliances formed at these conventions provided the major inroad for displaying and selling the Roho Cushion. William eventually assumed the bookkeeping duties for the corporation, as well.

In contrast to William's more recent involvement, Norma Jean Graebe made major contributions to the development of this product from its beginning. Both Robert and Norma lived with the project on a daily basis. The initial assembly work was conducted in the basement and garage of their family residence in Belleville, Illinois. Norma devoted her physical labor by working with the rubber parts of the cushion. She also did a great deal of paperwork for the company, operating an office on the second floor of their residence and functioning as bookkeeper and typist. After Roho's incorporation, she and Robert opened a Roho checking account. They were the only persons authorized to sign on this account. When her husband left McDonnel-Douglas in 1973 to spend more time on his invention, she obtained a real estate license and helped support the family with sales. Norma also shared the financial risks which were involved in forming a small family business. Together with her husband, she co-signed on loans totalling $10,000.

Since 1973, Robert Graebe and William Graebe received comparable salaries from the income of the corporation, without tax deductions. An employee, Otto Roberts, was paid personally out of the funds of Robert Graebe. During these same years, Norma Jean was not paid by Roho. Her husband testified that she drew no salary because the corporation had an insufficient amount of funds.

The small business functioned harmoniously for several years. Then, in the winter of 1976-77, a dispute arose over the balance of the 390 unissued shares. In August 1974, William had purchased 100 shares of stock at $10 per share. When William purchased these 100 shares, there was a discussion about the remaining 390 shares. Both men testified that William was to receive preference on their sale. Robert testified, however, that he believed the price would not be as low as $10 per share. William testified that he assumed the price would be $10 per share, unless the stock had to be sold elsewhere for financing purposes. When it became apparent that Robert did not wish to sell the remaining shares at $10 per share, hard feelings surfaced. Robert testified that his younger brother began missing work regularly and seemed overly obsessed with

the situation. He maintained that William had, prior to that time, never invested any capital in the venture. He noted that his brother did not offer to loan any money to Roho during the critical stages when Robert and Norma needed support, even though he had been present during the discussion involving money. William testified that he was unaware of the project's financial trouble and would have loaned money if asked. He also insisted that he continued to work regularly throughout the period of conflict.

Three months transpired between the initial dispute and the execution of the shareholders' agreement. Repeated discussions took place in which the brothers sought to resolve the trouble by clarifying William's role in the corporation. Norma Jean was aware of these discussions, but her brother-in-law would not allow her to attend or participate. Robert testified that he believed William was attempting to eliminate Norma Jean from the corporation through these negotiations.

The shareholders' agreement, which forms the subject matter of the present lawsuit, marks the culmination of their negotiations. The three-part document was typed by William's wife, Annette, pursuant to his instructions. It includes three lines at the bottom of page 2, and a date line. The date of April 29, 1977, is handwritten. Two of the three lines bear the identified signatures of Robert and William Graebe. Annette Graebe testified that she typed the document, and that the third line was for a notary. There is no jurat or other indication that this was so intended. Robert testified that the third line was for Norma Jean's signature. Robert and Norma Jean both testified that William knew that any resulting agreement concerning Roho Research and Development, Inc., could not be effective without Norma Jean's approval.

The contested document effects major revisions in the structure of the close corporation. Part I, entitled "Shareholders," attempts to reduce and limit the number of persons on the Roho Board of Directors. Under the terms of this provision, only the brothers could be board members. The agreement provides for four board members only if William's wife is made an equal member with Norma Jean. It also eliminates Norma Jean as a corporate officer. Part II, entitled "Stock Purchased By William F. Graebe," allows William to buy the remaining 39% of the Roho stock at $10 per share. This would bring his total ownership to 49%. Part III, entitled "W.F.G. Employment Contract," insures the younger brother permanent employment with the corporation, plus a number of other fringe benefits. In essence, the agreement removes Norma Jean from her position of influence in the corporation and installs William in a position nearly equal to Robert's.

After signing the document, William tendered Robert a check for $3900. Robert accepted the check and retendered the stock certificate for

390 shares. The certificate had been signed and sealed by Robert Graebe. This agreement was executed on Friday, April 29, 1977. On Monday, William went to work as usual. In the meantime, Norma Jean Graebe, angry with William because of his attempts to eliminate her from the company which she had helped to nurture from its creation and outraged at her husband for sacrificing her interests in order to maintain peace in the family, threatened to sue William and to divorce Robert. On Tuesday, Robert advised his brother that he was no longer welcome in the corporate business headquarters. This declaratory judgment action followed.

On appeal, William Graebe first contends that the trial court erred in holding that the approval of Norma Jean was a condition precedent to a valid April 29 agreement. Appellate argues that nothing in the final draft of the agreement expressly conditions the validity of the agreement on Norma's signature and thus it is enforceable without her approval.

■■ A condition precedent is one which must be performed before a contract becomes effective, or one which is to be performed by a party to an existing contract before the other party is obligated to perform. (*John J. Calnan Co. v. Talsma Builders, Inc.* (1979), 77 Ill. App. 3d 221, 225, 395 N.E.2d 1076.) In the present case, the trial court made a factual determination that there was an unfulfilled condition precedent. This finding was based upon a careful consideration of the testimony and upon an examination of the actual shareholders' agreement. The trial judge stated that he relied on "* * * the testimony of all the witnesses and their manner while testifying, their memory, any interest, bias or prejudice that they may have, and the reasonableness of their testimony in light of all the evidence in the case * * *." The record in this case is replete with probative facts to support the finding that Norma Jean Graebe's approval was a condition precedent to a valid agreement between the two brothers. Much of the evidence at trial detailed the time and effort expended by Robert and Norma in pioneering the Roho cushion. This factual testimony highlighted Norma Jean's long-term personal contribution. In addition to raising five children in her home, she participated in every aspect of the enterprise from its beginning in Wilmington, Delaware, in the late 1950's up to and including the filing of this litigation in 1978. The testimony showed that she baked prototypes of the invention in the family oven, cast them in the bathtub, prepared them in the basement and garage, and recorded the results of these efforts in the office space set aside in her bedroom. The evidence demonstrated her timely financial sacrifices as well as her invaluable moral support. Robert offered ample evidence that his wife's role in the family corporation was that of co-venturer or co-business manager. It is plain that her approval was a

condition precedent to any agreement affecting the future of Roho Research and Development, Inc.

The trial court also concluded that William's knowledge and consent to the condition precedent was manifested by the third unsigned signature line appearing at the bottom of the last page of the purported agreement. The signature line is no different from the two lines immediately above it which bear the signatures of William and Robert. There is no difference in spacing. There is likewise no jurat or other indication that it is a notary's signature line. It could serve no other purpose than for Norma Jean's signature. Testimony at trial indicates that this was the intent and understanding of Robert:

> "Q. What was your position with respect to Norma Jean either at a point in time or throughout the negotiations?
>
> A. She had to be involved. She had to approve.
>
> Q. And approve—You're talking about whatever agreement you two came to?
>
> A. All this is between two brothers. It's not two officers of the corporation. This was thrashing out some way we could salvage this family as an integral structure.
>
> Q. But to be specific, what was the position with respect to Norma Jean as the agreement?
>
> A. She had to sign. She had to approve. She had to be involved. The same thing with the corporation. The corporation had to approve * * *."

In his reply brief, appellant argues that this excerpt from the record should be read further, to include the following statement by Robert:

> "Now, we may not have gotten that far but that is intuitively obvious when you start doing these things, at least to me."

And in subsequent testimony, Robert responded to the attorney's questions:

> "Q. Now, all this was subject to Norma Jean's final approval, is that correct?
>
> A. That's correct.
>
> Q. That was understood certainly between you and Norma Jean?
>
> A. That's correct.
>
> Q. And it's your testimony that was understood between you and Bill?
>
> A. No, I didn't say that. I said I said that."

■■ Appellant urges us to consider these admissions by the elder Graebe as evidence that the parties never actually agreed to a term requiring third-party approval. However, we find that Norma's approval was a

condition implicitly understood by all persons connected with Roho, including William. Norma Jean's influence and control over corporate affairs was definitely negotiated prior to the execution of the agreement. Whether a particular disputed subject of negotiation has ultimately been embodied in the written agreement depends upon a determination of the intent of the parties. This intent is determined by examining their conduct, their language, and the context in which the document was drawn. (*Jannes v. Microwave Communication, Inc.* (1973), 16 Ill. App. 3d 582, 589, 306 N.E.2d 473.) Intent, as an issue of fact, must be determined by the trier of fact. When the determination of a case rests largely upon the findings of fact, a reviewing court will not disturb the trial court's determination as long as there is evidence in the record to support it. (*Jannes*, 16 Ill. App. 3d 582, 591.) In this case, the issue of fact is whether the parties intended to make Norma's signature a condition precedent to completion of the agreement. The trial court found evidence supporting the existence of such an intent. Because there are probative facts in the record to support this finding, we affirm the trial court's position.

Having held the agreement subject to an unfulfilled condition precedent, we need not address the remaining issues relating to its enforceability. We hereby affirm the judgment of the trial court.

Affirmed.

KARNS and JONES, JJ., concur.