**NEWMAN–GREEN, INC., et al., Plaintiffs,**

**v.**

**Alejandro ALFONZO–LARRAIN R., et al., Defendants.**

**No. 82 C 7933.**

United States District Court, N.D. Illinois, E.D.

Feb. 27, 1985.

Michael Sher, Rowe Snider, Friedman & Koven, Chicago, Ill., for plaintiffs.

Michael Connelly, Edward Ruberry, Connelly, Ruberry & Mustes, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Newman-Green, Inc. ("NGI") has charged Newman-Green de Venezuela ("NGV") and NGV shareholders Alejandro Alfonzo-Larrain R., Irene Larrain de Caplan, Rafael Tudela, Alberto Tudela and William Bettison (collectively "Guarantors"[1]) with violations of various agreements involving NGV's manufacture and sales in Venezuela of NGI's patented aerosol valves. Guarantors now move under Fed.R.Civ.P. ("Rule") 56 for summary judgment as to Count I of NGI's Amended Complaint. For the reasons stated in this memorandum opinion and order, their motion is denied.

### Facts

NGI, an Illinois corporation, has manufactured and sold patented aerosol valves for at least 30 years (NGI President Edward H. Green, Sr. Affidavit ["Green Aff."] ¶ 1). During the early 1970's NGI developed a business relationship with Guarantors out of a mutual desire to organize a Venezuelan company to manufacture and sell Newman-Green aerosol valves in Venezuela under an exclusive license from NGI. NGV was thus born. NGI owns 25% of NGV's capital stock, and Guarantors own the rest either directly or indirectly.

Following negotiations in both Illinois and Venezuela (Pl.Mem. 4), on June 13, 1974 NGI and NGV entered into a License Agreement (Def.EX. A). Because of then-recently-enacted Venezuelan legislation, the parties recognized the License Agreement would not become enforceable unless and until it was approved by SIEX, an administrative arm of the Venezuelan government (see Pl.Ex. A). NGV and Guarantors did not want to delay commencement of operations until approval was obtained (in which respect the lack of any SIEX track record made the timetable uncertain), while NGI was unwilling to risk any sale of its machinery or any provision of know-how to NGV absent further contractual assurances (Green Aff. ¶ 4). That gap was bridged by NGV's and Guarantors' tendering of two additional letter agreements:

1. NGV's Confidentiality Agreement (App. A) ensuring protection of NGI's trade secrets; and

2. Guarantors' Guaranty Agreement (App. B)[2] ensuring payment of royalties to NGI.

Both agreements were executed July 11, 1974. NGV president Alberto Tudela had drafted the Confidentiality Agreement, while it appears NGI attorney Perry Carvellas (Def.R.Mem. 9) had drafted the Guaranty Agreement.

After the Confidentiality Agreement and Guaranty Agreement were signed, NGI began performance by:

1. selling NGV valve-assembly machinery and valve components; and

---

1. Though the text refers to those individual defendants as "Guarantors," citations to their memoranda and exhibits will take the more simplified form "Def.Mem.," "Def.R.Mem." and "Def.Ex."

2. Although the parties' memoranda use the spelling "Guarantee Agreement," the document itself bears no caption (it is in the form of a letter), and its body contains the word "guarantee" only once—used properly as a transitive verb. This opinion follows this Court's customary usage of "guaranty" as a noun (or adjectival noun) and "guarantee" as a transitive verb. See the listing in Webster's Third New International Dictionary 1007 for "guarantee" as an alternate spelling of the noun (Webster's indicates the "ee" ending, when used for the noun, is probably a bastardization of the correct "y" ending, the alteration stemming from a false analogy to such words as "assignee" and "lessee").

2. providing technical training and assistance to NGV, both at NGI's Illinois plant and NGV's Venezuelan plant.

NGV began manufacturing and selling aerosol valves July 1, 1975. Between 1975 and 1980 NGV's sales revenue from the valves exceeded $7 million.

SIEX never approved the License Agreement. In December 1977 SIEX indicated it would do so with substantial modifications (Def.Ex. 4), but NGI found the changes unacceptable and they were never made.

Despite its large sales volume, NGV never made any royalty payments to NGI. NGV apparently created a reserve fund for that purpose (Def.Ex. 5), but largely because of the SIEX problem the parties never worked out a mutually acceptable and legal way to transfer the funds to NGI (Def.Exs. 5, 7, 8).

On January 25, 1979 NGI terminated and withdrew the still-unapproved License Agreement and also terminated its relationship with NGV. NGV continued to manufacture and sell the aerosol valves until May 1980. Because NGI never received royalty payments from NGV, NGI demanded royalty payments of approximately $350,000 from Guarantors pursuant to the Guaranty Agreement. Guarantors have refused, and NGI seeks enforcement of that obligation in Count I.

Guarantors' summary judgment theory is that Venezuelan law controls the validity of the Guaranty Agreement and renders it unenforceable.[3] NGI has not disputed the outcome under Venezuelan law, contending instead that Illinois law applies and renders the Guaranty Agreement enforceable.

### Summary Judgment Considerations

Rule 56 requires this Court to view the underlying facts in the light most favorable to NGI. *Hermes v. Hein*, 742 F.2d 350,

353 (7th Cir.1984). As movants, Guarantors have the burden of showing there is no genuine issue of material fact. *Egger v. Phillips*, 710 F.2d 292, 296 (7th Cir.1983). It is an understatement to say they have failed to meet that burden.

Guarantors are entitled to summary judgment only if they establish one of two results as a matter of law:

1. Under applicable choice-of-law rules, Venezuelan law controls (and negates) enforceability of the Guaranty Agreement.

2. If instead Illinois law controls, it similarly renders the Guaranty Agreement unenforceable.

As this opinion will reflect, however, each of those propositions ultimately depends on the intention of the parties to the Guaranty Agreement.

■ Under applicable Illinois law[4] the question of intent (except, of course, as intent may be manifested by an unambiguous contract) is an issue of fact. *Graebe v. Graebe*, 95 Ill.App.3d 1144, 1150, 51 Ill. Dec. 537, 542, 420 N.E.2d 1095, 1100 (5th Dist.1981). And on that score analysis demonstrates that precisely the opposite of what Guarantors must prove is true: Either (1) the choice of law and the type of guaranty expressed in the Guaranty Agreement both favor NGI's position as a matter of law or (2) a fortiori there are genuine issues of material fact as to both those subjects.

### Parties' Choice of Law

■ In this diversity action *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496–98, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941) requires this Court to look to Illinois' conflict-of-laws rules. One such rule permits parties to a contract to specify the law applicable to

---

**3.** Guarantors first point to Venezuela Civil Code Article 1.805:

> A guaranty may not be undertaken except in order to guarantee a valid obligation.

Their Mem. 19 then cites various commentaries on Venezuelan law to the effect that a guaranty cannot stand as a separate obligation and is thus invalid whenever, as here, the principal obligation is invalid.

**4.** Guarantors concede (as they must, given the clear choice-of-law contractual language quoted later in the text) Illinois law applies in interpreting the Guaranty Agreement.

their agreement. *Hofeld v. Nationwide Life Insurance Co.*, 59 Ill.2d 522, 529, 322 N.E.2d 454, 458 (1975). Only when parties fail to make a valid choice of law do courts apply the traditional conflict-of-laws rules or engage in the "most significant contacts" analysis of the Restatement (Second) of Conflict of Laws ("Restatement") § 188 (1971).

■ Each of the three agreements involving NGI, NGV and Guarantors contains a choice-of-law provision, and each prescribes Illinois law:

1. License Agreement § XXIII: "This agreement shall be construed under the laws of the State of Illinois, United States of America."

2. Confidentiality Agreement: "This agreement is to be interpreted under the laws of the State of Illinois, U.S.A."

3. Guaranty Agreement: "The agreement is to be interpreted in accordance with the laws of the State of Illinois."

Obviously recognizing their task is one suited to Orwellian Doublethink—turning the natural meaning of language on its head, as in "Peace is War" and "Love is Hate"—Guarantors seek to convert the quoted provision of the Guaranty Agreement into a decision by the parties that Venezuelan law rather than Illinois law provides important rules of decision here. They contend the agreements chose Illinois law only for the purpose of interpreting the meaning of the agreements, but the parties chose Venezuelan law to govern enforceability of all the contracts.

That extraordinary notion is built on an obviously false premise. First Guarantors point to the NGV–NGI recognition in the Confidentiality Agreement that the *License* Agreement's enforceability depended on Venezuelan law:

It is understood that because of recent enacted legislation the license agreement will not become enforceable until such time as the provisions of the agreement are approved by the Venezuelan government.

Of course that statement of understanding is not itself a choice-of-law agreement. Nevertheless Guarantors argue it indicates an understanding that all three actual choice-of-law provisions were meant to reserve questions of enforceability to Venezuelan law. Consistency demands, they say, reading all three choice-of-law clauses in the same manner.

Were that indeed so, it would merely reconfirm the validity of Emerson's aphorism:

Foolish consistency is the hobgoblin of little minds.

But Guarantors' contention is obviously flawed. To return to this Court's earlier allusion, this is 1985 not 1984, and Guarantors' indulging in Doublethink has convinced no one (excepting perhaps themselves).

Both the sequence of the agreements and the very language cited by Guarantors lead to a conclusion wholly contrary to that urged by them. NGV and NGI first executed the License Agreement. Obviously they quickly realized (Green Aff. ¶ 4 and Carvellas Aff. ¶ 4 confirm this) the problems that would be posed by any attempted performance under an agreement that was prevented from going into effect by the newly-enacted legislation.[5] Thus their prompt negotiation and execution of the Confidentiality and Guaranty Agreements—separate and distinct contracts from the earlier License Agreement—betoken a meaning for the quoted language precisely the opposite from that now suggested by Guarantors. Consistently with that common-sense analysis, NGI says the very reasons it insisted on execution of the Confidentiality and Guaranty Agreements were (1) its understanding the License

---

5. In addition to the patent need for concern as to whether NGI could collect for goods and services delivered and royalties earned under the License Agreement, questions were plainly present as to the enforceability in a Venezuelan court of the License Agreement's Illinois choice-of-law paragraph and, relatedly, as to whether an Illinois court could assert jurisdiction over NGV. It may be noted NGI requested and obtained terms in the Guaranty Agreement by which Guarantors specifically submitted to Illinois jurisdiction.

Agreement was unenforceable in Venezuela (Green Aff. ¶ 4, Carvellas Aff. ¶ 4) and (2) its desire to bind Guarantors and NGV to undertakings that *were* enforceable.

Acutely aware the Guaranty Agreement would be (or was at least likely to be) unenforceable if it had to be sued on in Venezuela, NGI goes on to argue, the parties must have intended their choice of Illinois law to extend to enforceability. Were that not the case, the result would be that the parties deliberately went through a meaningless charade: They negotiated, and then acted in reliance on, separate agreements knowing they could have no separate viability. That is of course absurd. It impermissibly ascribes no independent substantive effect at all to contracts that the contracting parties plainly treated as critical preconditions to their commencement of performance.

No language in the Guaranty Agreement expressly contrasts "interpretation" with "enforceability" or specifies that the latter is to look to a different source of law than the parties prescribed for the former. Of course parties are sometimes more precise than were the parties here in addressing (or appearing to address) choice of law as to enforceability.[6] See, e.g., *Bense v. Interstate Battery System of America, Inc.,* 683 F.2d 718, 722 (2d Cir.1982) ("This agreement is to be governed by and construed according to the laws of the State of Texas"); *Mon-Shore Management, Inc. v. Family Media, Inc.,* 584 F.Supp. 186, 193 (S.D.N.Y.1984) ("[A]ll rights and obligations of the parties hereunder shall be governed as to validity, construction, and in all other respects by the law of New York").

However the absence of a provision dividing up the choice of law into component parts gives Guarantors no real comfort. Even apart from the consideration identified in n. 6, courts have read choice-of-law

clauses much like that in the Guaranty Agreement as extending to issues of enforceability. See, e.g., *Boatland, Inc. v. Brunswick Corp.,* 558 F.2d 818, 821–22 (6th Cir.1977) (agreement to be "interpreted and construed according to" Wisconsin law); *C.A. May Marine Supply Co. v. Brunswick Corp.,* 557 F.2d 1163, 1165 (5th Cir.1977) (per curiam) (same). Finally, *Keller v. Brunswick Corp.,* 54 Ill.App.3d 271, 275, 11 Ill.Dec. 873, 875, 369 N.E.2d 327, 329 (4th Dist.1977) recognizes the possibility of a bifurcated choice but does not—as defendants contend—support the assertion the parties here chose one jurisdiction's law for interpretation and another's for enforceability. No Illinois case of which this Court is aware (and neither of the non-Illinois cases cited in *Keller*):

1. finds the parties made such a bifurcated choice or

2. applies the law of two different jurisdictions to the same contract.

■ Illinois courts treat the meaning of an unambiguous contract as a question of law for the court. *National Tea Co. v. Commerce & Industry Insurance Co.,* 119 Ill.App.3d 195, 199–200, 74 Ill.Dec. 704, 708, 456 N.E.2d 206, 210 (1st Dist.1983). That principle could well mandate a definitive ruling in favor of NGI (not Guarantors) on Count I, for this Court would be hard pressed to find an ambiguity in the Guaranty Agreement. But prescinding that question, which need not be decided on the present motion, at the very worst an ambiguity might be found in the contract. And in that event NGI has established a genuine issue of fact as to whether the parties intended Illinois law to govern enforceability of the Guaranty Agreement. Resolution of that factual issue would ultimately require a weighing of the language used, the conduct of the parties and the broader context of the agreement.[7] *Graebe,* 95 Ill.

---

6. That cuts both ways—or neither way. Had the parties "clearly" intended Venezuelan law to control enforceability, as Guarantors urge, they could readily have inserted a clause to that effect. They did not.

7. Guarantors could not avoid the factual issue by invoking the rule that guaranty contracts are strictly construed in favor of guarantors. *Telegraph Savings & Loan Ass'n v. Guaranty Bank & Trust Co.,* 67 Ill.App.3d 790, 794, 24 Ill.Dec. 330, 333–34, 385 N.E.2d 97, 100–01 (1st Dist.1978) (citation omitted) explains:

App.3d at 1150, 51 Ill.Dec. at 542, 420 N.E.2d at 1100.

■ To be sure, the choice-of-law inquiry does not end with a determination of the parties' intent, for Illinois courts do not automatically give effect to contracting parties' express choice of law. Most notably, Illinois cases have often said the chosen law must not violate a fundamental public policy of Illinois.[8] *Mell v. Goodbody & Co.*, 10 Ill.App.3d 809, 813, 295 N.E.2d 97, 100 (1st Dist.1973). That "public policy" doctrine, which was limited and sharply criticized in *Champagnie v. W.E. O'Neil Construction Co.*, 77 Ill.App.3d 136, 139–43, 32 Ill.Dec. 609, 611–14, 395 N.E.2d 990, 992–95 (1st Dist.1979), does not apply here in any event. By definition the application of Illinois law ensures, rather than imperiling, the fulfillment of Illinois public policy.

More precisely, the question is whether an Illinois court would defer to Venezuelan law on enforceability—*in spite of* the parties' choice of Illinois law—to protect a *Venezuelan* public policy. That possibility is expressed in Restatement § 187(2)(b), under which the parties' choice of law will not be respected when:

> application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

True enough, no Illinois court has ever adopted (or even discussed) that rule.

> But where the express terms of the contract are ambiguous, or there is a question regarding the intention of the parties, the rule of strict construction is not brought into play until the intention is determined from the declarations and conduct of the parties or from the surrounding circumstances.

8. There have been suggestions of a second limitation: that the contract must bear a "reasonable relationship" to the state whose law is chosen. But as this Court explained in *Intamin, Inc. v. Figley-Wright Contractors, Inc.*, 595 F.Supp. 1350 (N.D.Ill.1984), the official com-

However, it bears consideration in light of the Illinois courts' adoption of the Restatement's approach in other areas of law [9] and their increasing reliance on the Restatement in the realm of contracts. *Champagnie*, 77 Ill.App.3d at 144–46, 32 Ill.Dec. at 615–16, 395 N.E.2d at 996–97; *American Food Management, Inc. v. Henson*, 105 Ill.App.3d 141, 147, 61 Ill.Dec. 122, 127, 434 N.E.2d 59, 64 (5th Dist.1982).

Even if such scrutiny led to a decision Restatement § 187 were to be applied here, Guarantors would fare no better. Let us assume arguendo the SIEX legislation was a Venezuelan law aimed at protecting that country's nationals from overreaching by foreign investors. But Venezuela's assumed interest in thus sheltering its nationals cannot be deemed "materially greater" than Illinois' interest in protecting *its* citizens from the unjust enrichment of foreigners who obtain valuable property (by entering into contracts they do not intend to honor) and try to escape just liability for its payment.[10] And the latter result is all the Guaranty Agreement seeks to avoid. Accordingly Restatement § 187(2)(b) would not invalidate the parties' choice of Illinois law, even if Venezuelan law prevailed in the "most significant contracts" balancing of Restatement § 188.

### Enforceability of the Guaranty Agreement under Illinois Law

That leaves for decision whether an Illinois court applying Illinois law would find the Guaranty Agreement enforceable. Guarantors assert a guarantor's obligation must be co-extensive with that of the principal, citing *State Bank of Blue Island v.*

ment to UCC § 1–105 seems to dispense with such a requirement, as does Restatement § 187 Comment (f).

9. See, e.g., *Ingersoll v. Klein*, 46 Ill.2d 42, 262 N.E.2d 593 (1970) (tort cases); *Ford v. Newman*, 64 Ill.App.3d 528, 21 Ill.Dec. 283, 381 N.E.2d 392 (4th Dist.1978) (trusts and wills).

10. This opinion does not of course *decide* Guarantors' conduct fits that description. For purposes of the present motion, however, it must be assumed NGI can prevail on the merits.

*Benzing,* 383 Ill. 40, 54–55, 48 N.E.2d 333, 340 (1943); *Mercantile Trust Co. of Illinois v. Kastor,* 273 Ill. 332, 342–43, 112 N.E. 988, 992 (1916); and *Dormeyer v. Haffa,* 343 Ill.App. 177, 180–81, 98 N.E.2d 532, 534 (1st Dist.1951). If so, the unenforceability of the License Agreement against NGV would compel unenforceability of the Guaranty Agreement against Guarantors.

Once again Guarantors try to stretch case law beyond its proper bounds. All the cited cases involved only guaranties of *performance* that expressly incorporated the terms and conditions of the principal obligation. But guaranties of *payment,* such as that at issue here, are not logically limited in the same way.

■ After all, guaranty agreements are simply contracts. As such they may be subject to conditions established by the parties (*State Bank of East Moline v. Cirivello,* 74 Ill.2d 426, 431, 24 Ill.Dec. 839, 841, 386 N.E.2d 43, 45 (1978); *Lawndale Steel Co. v. Appel,* 98 Ill.App.3d 167, 170, 53 Ill.Dec. 288, 291, 423 N.E.2d 957, 960 (2d Dist.1981)), or they may be unconditional, independent undertakings (*Beebe v. Kirkpatrick,* 321 Ill. 612, 616, 152 N.E. 539, 540–41 (1926); *Brown Plastering Co. v. Gottschalk,* 261 Ill.App. 147, 152 (1st Dist. 1931)). *Brown* for example held that when a guaranty is "founded upon a new and independent consideration" it becomes an independent contract whose enforceability is unaffected by the validity vel non of the principal obligation. Such is the case, at least under NGI's version of the facts, with the guaranty at issue here.

In relevant part the Guaranty Agreement reads:

> In consideration for the execution of the license agreement dated June 13, 1974 from Newman-Green, Inc., Addison, Illinois to Newman-Green de Venezuela, the undersigned personally, individually and/or collectively agree that they guarantee the payment to Newman-Green, Inc. of an amount of money up to the 5%

royalty set forth in the license agreement and for the period of time specified in the license agreement.

Nowhere does the guaranty adopt all the terms and conditions of the License Agreement, nor does it expressly condition enforceability on the validity of the License Agreement. Indeed, just as with Guarantors' argument dealt with earlier in this opinion, it would be absurd to imply such a condition—which would frustrate the entire purpose for which the guaranty was requested and given.

Finally, no significance is to be accorded the recital of "execution of the license agreement" as consideration for the Guaranty Agreement. Both NGI's version of the facts and the parties' conduct amply demonstrate additional and independent consideration to support the guaranty. According to the Green and Carvellas affidavits, NGI was unwilling to begin performance of the License Agreement without having received the additional assurances of the Guaranty and Confidentiality Agreements. NGI's promise to provide NGV with machinery, information and training, despite the uncertainties surrounding the License Agreement, constituted independent consideration sufficient to render the guaranty an independent contract. Were there any doubt on that score, the fact of NGI's having performed as it promised would erase that doubt.

Once more this Court could well make an ultimate finding in NGI's favor on the issue of enforceability. For current purposes that is unnecessary. Suffice it to say NGI has raised a genuine issue of fact that precludes summary judgment.[11]

### Conclusion

At a minimum, NGI has raised genuine issues of material fact concerning the parties' intentions as to their choice of law and the conditions of enforceability of the

---

11. Again Guarantors cannot avoid that factual uncertainty by invoking the rule that guaranty agreements are to be strictly construed in favor of the guarantor. See n. 7.

Guaranty Agreement. Guarantors are clearly not entitled to judgment as a matter of law. Summary judgment on Complaint Count I accordingly must be and is denied.

APPENDIX A

July 11, 1974

Mr. Edward H. Green,
President
Newman-Green, Inc.
57 Interstate Road
Addison, Illinois 60101
U.S.A.

Re: License Agreement
    Newman-Green, Inc. Addison/
    Newman-Green de Venezuela

Dear Mr. Green:

This letter is to confirm the recent discussions during which it was expressed that Newman-Green, Inc., Addison, Illinois and Newman-Green de Venezuela are desirous of entering into a license agreement whereby Newman-Green de Venezuela will be licensed to manufacture and sell Newman-Green aerosol valves in Venezuela. Pursuant to the discussions a license agreement was signed on June 13, 1974. It is understood that because of recent enacted legislation in Venezuela the license agreement will not become enforceable until such time as the provisions of the agreement are approved by the Venezuelan Government.

In consideration of the covenants herein entered into between the parties, it is agreed that pending the approval of said license agreement that Newman-Green, Inc. will undertake to provide to Newman-Green de Venezuela aerosol valve assembly machinery embodying the proprietary, confidential and technical information and know-how of Newman-Green, Inc. It is further agreed that Newman-Green, Inc., will provide additional proprietary, confidential and technical information and know-how of Newman-Green, Inc. to a designated employee of Newman-Green de Venezuela. The additional information is to be such that it will be sufficient to allow start-up and operation of the valve assembly machinery provided to Newman-Green de Venezuela. The amount and sufficiency of the additional information is to be determined by Newman-Green, Inc. It is understood and agreed that all of the aforesaid information is provided in confidence and under the terms and conditions of the license agreement.

It is further agreed, in the event that for any reason the license agreement is not approved by the Venezuelan Government, that the confidentiality provisions and the termination and/or cancellation provisions of the license agreement are in full force and effect.

This agreement is to be interpreted under the laws of the State of Illinois, U.S.A.

Signed at Caracas, Venezuela.

NEWMAN-GREEN DE VENEZUELA

By: /s/ Alberto Tudela
          Alberto Tudela
          President

APPENDIX B

July 11, 1974

Mr. Edward H. Green, President
Newman-Green, Inc.
57 Interstate Road
Addison, Illinois 60101
U.S.A.

Re: Newman-Green, Inc. and
Newman-Green de Venezuela
License Agreement

Dear Mr. Green:

In consideration for the execution of the license agreement dated June 13, 1974 from Newman-Green, Inc., Addison, Illinois to Newman-Green de Venezuela, the undersigned personally, individually and/or collectively agree that they guarantee the payment to Newman-Green, Inc. of an amount of money up to the 5% royalty set forth in the license agreement and for the period of time specified in the license agreement.

For the purposes of this agreement the undersigned agree by virtue of the license agreement between Newman-Green, Inc. and Newman-Green de Venezuela that they are doing business in Addison, Illinois and designate as their individual and collective agent for service John E. Waghorne, Esq., Ace Avenue and Lake Street, Addison, Illinois 60101. The designation of agent is not revocable without the written consent of Newman-Green, Inc., Addison, Illinois.

The agreement is to be interpreted in accordance with the laws of the State of Illinois.

The effective date of this agreement is July 11, 1974.

Signed at Caracas, Venezuela.

/s/ Rafael Tudela
     Rafael Tudela
     Apartado 59053

/s/ William Bettison
     William Bettison
     Apartado 1286

/s/ Alberto Tudela
     Alberto Tudela
     Apartado 68658

/s/ Mrs. M. Caplan
     Mrs. M. Caplan
     Apartado 1286

/s/ A. Alfonzo-Larrain
     A. Alfonzo-Larrain
     Apartado 1286

Rafael Tudela
Address:
Avda. Las Ciencias c/ Edison
Edif. Edison, Piso 1
Los Chaguaramos
Caracas.—

William L. Bettison
Address
Edif. Helados Club
Calle Las Mercedes,
Chacao
Caracas.—

Alberto Tudela
Address:
Centro Plaza, Piso 7, Torre B
Avda. Francisco de Miranda
Los Palos Grandes
Caracas.—

Irene Larrain de Caplan
Address:
Calle vuelta del Zorro
Quinta Escondida
Valle Arriba
Caracas.—

A. Alfonzo-Larrain R.
Address:
Edif. Aldemo, Piso 6
Avenida Venezuela, El Rosal
Caracas.—