**NEWMAN–GREEN, INC., et al., Plaintiffs,**

v.

**Alejandro ALFONZO–LARRAIN R., et al., Defendants.**

No. 82 C 7933.

United States District Court, N.D. Illinois, E.D.

June 26, 1985.

---

Rowe Snider, Michael Sher, Daniel Lesser, Friedman & Koven, Chicago, Ill., for plaintiffs.

Michael P. Connelly, John W. Patton, Jr., Connelly, Ruberry & Mustes, Chicago, Ill., for defendants.

### MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Newman-Green, Inc. ("NGI") has charged Newman-Green de Venezuela ("NGV") and NGV shareholders Alejandro Alfonzo-Larrain R., Irene Larrain de Caplan, Rafael Tudela, Alberto Tudela and William Bettison (collectively "Guarantors"[1]) with violations of various agreements involving NGV's manufacture and

---

1. Though the text refers to those individual defendants as "Guarantors," citations to their memorandum will take the more simplified form "Def. Mem."

sales in Venezuela of NGI's patented aerosol valves. NGI now moves under Fed.R. Civ.P. ("Rule") 56 for summary judgment as to Count I of NGI's Amended Complaint. For the reasons stated in this memorandum opinion and order, summary judgment is granted as to liability, with damages yet to be determined.

### Facts

On February 27, 1985 (in the "Opinion," 605 F.Supp. 793) this Court denied Guarantors' motion for summary judgment as to Count I. Appendix A to this memorandum opinion and order comprises (1) the statement of facts from the Opinion, equally applicable here,[2] and (2) the two letter agreements at the heart of this dispute.

### Guarantors' Contentions

In opposition to NGI's motion, Guarantors rely in principal part on premises this Court has already rejected in the Opinion. From those flawed premises they purport to find the documents ambiguous. They then tender evidentiary material that assertedly shows:

1. It was the parties' intention that the Guaranty Agreement not take effect until after SIEX approval of the License Agreement.

2. NGI is not entitled to payments from Guarantors because it "frustrated" SIEX's approval of the License Agreement, thus preventing performance of the principal obligation.

Guarantors also address the measure of damages in case the Guaranty Agreement is determined to be enforceable against them. They propose two limitations on the extent of their liability:

1. Despite its 5% language, they say the Guaranty Agreement was meant only to supplement the anticipated 3% royalty provision of a modified License Agreement. According to them, Guarantors were to be liable only for the 2% *difference* between the amount of royalties permitted by SIEX and that desired by NGI.

2. For purposes of converting Guarantors' obligation (measured in bolivares) to dollars, the applicable exchange rate is that prevailing on the date of judgment rather than the date of Guarantors' breach of their agreement.

### Rules of Construction [3]

Illinois courts treat the meaning of an unambiguous contract as a question of law for the court. *National Tea Co. v. Commerce & Industry Insurance Co.*, 119 Ill. App.3d 195, 199–200, 74 Ill.Dec. 704, 708, 456 N.E.2d 206, 210 (1st Dist.1983). Guarantors seek to avoid that rule (and hence summary judgment) by characterizing the Guaranty Agreement as ambiguous, and then by presenting evidence they say raises a factual issue as to the parties' intentions when they put pen to paper.

But the threshold issue whether a contract is ambiguous is itself a question of law, not fact. *Joseph v. Lake Michigan*

---

**2.** Rule 56 imposes on the party moving for summary judgment the burden of establishing the lack of a genuine issue of material fact. *Korf v. Ball State University*, 726 F.2d 1222, 1226 (7th Cir.1984). For that purpose the court must, in viewing the evidence, draw all reasonable inferences in the light most favorable to the nonmovants—here, Guarantors. *Hermes v. Hein*, 742 F.2d 350, 353 (7th Cir.1984). Because the earlier statement of facts was written on Guarantors' motion, this Court was then obliged to view the facts from a perspective most favorable to NGI. This Court's current rehearsal of that statement discloses its factual assertions are really undisputed by Guarantors (who incidentally failed to file the statement of genuine issues required by this District Court's Local Rule 12(f) and are

therefore foreclosed from asserting contested factual issues exist). Accordingly this Court, while relying on the same statement of facts as before, will draw all reasonable inferences in the opposite direction.

**3.** In light of the parties' choice of Illinois law and for the reasons discussed at some length in the Opinion, 605 F.Supp. at 795–98, this opinion looks to Illinois law throughout. Guarantors have presented neither evidence nor argument, on the current motion, to counter this Court's interpretation of the documents' Illinois choice-of-law provisions as embracing all relevant questions, including enforceability of the Guaranty Agreement.

*Mortgage Co.,* 106 Ill.App.3d 988, 991, 62 Ill.Dec. 637, 640, 436 N.E.2d 663, 665 (1st Dist.1982). For that purpose a contract is ambiguous only if it is "reasonably and fairly susceptible to more than one meaning." *Lenzi v. Morkin,* 116 Ill.App.3d 1014, 1016, 72 Ill.Dec. 414, 416, 452 N.E.2d 667, 669 (1st Dist.1983). Ambiguity is not established by mere disagreement of the parties as to the contract's meaning. *Bank of Homewood v. Sjo,* 113 Ill.App.3d 179, 183, 68 Ill.Dec. 817, 820, 446 N.E.2d 1214, 1217 (1st Dist.1983). And an unambiguous agreement "must be given a fair and reasonable interpretation by the courts based on a consideration of the language and provisions contained therein." *Arthur Rubloff & Co. v. Comco Corp.,* 63 Ill. App.3d 362, 367, 20 Ill.Dec. 338, 342, 380 N.E.2d 15, 19 (2d Dist.1978).

### Independent Viability of the Guaranty Agreement

■ Because the Confidentiality and Guaranty Agreements were executed at the same time in the course of the same transaction, they must be read and construed together.[4] *Thread and Gage Co. v. Kucinski,* 116 Ill.App.3d 178, 182, 71 Ill. Dec. 925, 928, 451 N.E.2d 1292, 1295 (1st Dist.1983). And when they *are* read together, the Guaranty Agreement is not at all "reasonably and fairly susceptible to" the interpretation urged by Guarantors.

■ There is no question enforcement of the Confidentiality Agreement did not depend in any respect on enforceability of the License Agreement. On the contrary, unenforceability of the License Agreement was the very predicate for the existence of the Confidentiality Agreement:

It is understood that because of recent enacted legislation in Venezuela the license agreement will not become en-

---

**4.** This is the well-known "contemporaneous execution" rule. True enough, unlike the usual situation in which the doctrine is applied, the parties to the contemporaneously-signed agreements here were not identical. But of course that makes no difference—indeed, by definition a guarantor must be a party different from the principal obligor. Here NGI's insistence on the

forceable until such time as the provisions of the agreement are approved by the Venezuelan Government.

In consideration of the covenants herein entered into between the parties, it is agreed that pending the approval of said license agreement that Newman-Green, Inc. will undertake to provide to Newman-Green de Venezuela aerosol valve assembly machinery embodying the proprietary, confidential and technical information and know-how of Newman-Green, Inc.

Thus the purpose and effect of the Confidentiality Agreement were to provide NGV the benefits it had bargained for in the License Agreement—but to do so in the period of unknown duration before the License Agreement could become enforceable under Venezuelan law. In turn, those benefits triggered royalty burdens under the License Agreement—but burdens that could not be enforced directly under that Agreement so long as Venezuelan law alone controlled. Clearly the only rational reading of the Guaranty Agreement is as a means to assure NGI's recovery of the corollary benefits defined by the License Agreement, corresponding directly to the benefits derived by NGV while SIEX approval of the License Agreement was pending.

■ Guarantors attempt to avoid reading the Guaranty and Confidentiality provisions in tandem by pointing out:

1. the Guaranty Agreement's caption refers to "License Agreement";

2. the text of the Guaranty Agreement is replete with references to the License Agreement; and

3. the Guaranty Agreement makes no reference to the Confidentiality Agreement.

---

Guaranty Agreement (an insistence accepted by Guarantors) was a condition to its willingness to go forward with the Confidentiality Agreement. What the parties collectively have thus joined together, no one of them can put asunder—and that extends to Guarantors' efforts to read the Guaranty Agreement in a vacuum.

But the cases applying the "contemporaneous execution" rule do not require the documents to make explicit reference to one another.[5] Instead the common circumstances of their execution suffice to bind them into a single unit for contract construction purposes. And the Guaranty Agreement's references to the License Agreement reinforce rather than undercut the plain reading given by the Opinion and this opinion. What the Confidentiality Agreement contemplated (and accomplished) was the creation of NGV performance of its License Agreement undertakings, to get NGI under way before formal SIEX approval had been obtained. Of course the natural way to define *Guarantors' responsibility*— an obligation to match that NGV performance with the correlative royalties—was to state their responsibility in terms of the License Agreement's formula and term. They did exactly that in the Guaranty Agreement:

> In consideration for the execution of the license agreement dated June 13, 1974 from Newman-Green, Inc., Addison, Illinois to Newman-Green de Venezuela, the undersigned personally, individually and/or collectively agree that they guarantee the payment to Newman-Green, Inc. of an amount of money up to the 5% royalty set forth in the license agreement and for the period of time specified in the license agreement.

In much the same way, the Confidentiality Agreement also referred to the License Agreement to define the scope of the parties' responsibilities, rather than repeating the terms and conditions of the other agreement simply to produce a self-contained document. Plainly Guarantors cannot say those references somehow made the enforceability of the Confidentiality Agreement dependent on enforceability of the License Agreement. No more reason exists for reading such an implied condition into the Guaranty Agreement.

Guarantors Mem. 2 says to interpret the Guaranty Agreement as requiring royalty payments before SIEX approval of the License Agreement would be "to postulate that the parties contemplated operating illegally in the event anything but the entire license agreement was approved." But Guarantors' asserted interpretation suffers from precisely the same asserted infirmity: Guarantors would still operate in violation of SIEX strictures, this time by ensuring royalty payments in excess of SIEX-approved levels.[6]

Thus Guarantors are really foreclosed by the plain meaning of the unambiguous documents, before they even get into their asserted issues of fact. But the poverty of their position is reconfirmed by the fact their only evidence in support of their interpretation—the deposition testimony of Guarantor William Bettison, Jr. ("Bettison")[7]—would fail even were it admissible to raise a genuine issue of fact.

Although Bettison claimed his understanding was the Guaranty Agreement would not take effect before SIEX approval of the License Agreement, he:

> 1. specifically admitted the Guaranty Agreement contains no language supporting his interpretation (Dep. 217–19); and
>
> 2. also acknowledged Guarantors had neither communicated that understanding to NGI nor discussed the issue with NGI in any fashion (Dep. 228).

Thus Guarantors have produced no evidence at all of a *mutual* intent or understanding to exclude from the Guaranty Agreement any royalty obligations accruing before SIEX approval of the License Agreement.

In fact, Bettison's testimony suggests the contrary. Bettison conceded NGI was ada-

---

**5.** Guarantors cite no authority that even suggests, let alone requires, that the documents must refer to one another.

**6.** This Court makes no finding whether one arrangement or another would be illegal (no such determination is necessary here).

**7.** All references to Bettison's testimony relate to the first day of his deposition (July 30, 1984) and will take the form "Dep.—."

mant in its insistence on a 5% royalty (Dep. 137–39). NGI found the anticipated SIEX 3% royalty limitation utterly unacceptable, and Guarantors understood NGI would not perform even under the Confidentiality Agreement without an assurance the SIEX royalty limitation would be overcome (*id.*). NGI refused to allow NGV's representative even to enter NGI's factory for training under the Confidentiality Agreement until a satisfactory royalty arrangement was worked out (*id.* at 137–38).

It is patently absurd for Guarantors to maintain, in the face of NGI's persistent concern over royalties, that NGI was willing to perform without *any* royalties for the indefinite period before SIEX approval. Parties opposing summary judgment are entitled to favorable factual inferences, but those inferences must be *reasonable.* Even were Guarantors able to overcome the first hurdle to permit introduction of their proposed evidence (and they have not), the inferences they seek to draw fail the reasonableness test.

### NGI's Asserted "Frustration" of SIEX Approval

Guarantors' "frustration" argument grasps at straws. Although poorly articulated, it seems to assert (Def. Mem. 8–11):

1. After considerable back-and-forth, the parties reached a deal under which NGI would accept a SIEX royalty limitation of 3% in return for NGV's agreement to make up the difference by adding 2% to the cost of goods purchased from NGI.

2. Thereafter SIEX offered to approve the license agreement with a 3% royalty limit.

3. NGI then reneged without justification.

4. Because NGI's actions prevented NGV's performance of the principal obligation, it would be unfair to subject Guarantors to liability under the Guaranty Agreement.

Even if the first three steps in that sequence were established, Guarantors have offered no authority to support their rather bizarre notion that NGI's conduct should excuse Guarantors' obligation under an unconditional guaranty of *payment* for the production NGV *did* complete. But that issue need not be reached, for Guarantors' "factual" assertions are even more fanciful than their legal conclusion. Bettison's very deposition testimony Guarantors offer in support of their frustration argument demonstrates:

1. NGI and NGV never agreed to compensate for lost royalties by adding 2% to the cost of goods sold to NGV (Dep. 216–19).

2. SIEX required a number of changes in the License Agreement besides a limitation on royalties.

3. Guarantors were aware, even before the agreement was presented to SIEX, that SIEX would require those other changes and those changes would be unacceptable to NGI (Dep. 202–04).

Accordingly Guarantors' "frustration" contention is itself frustrated at every level.

### Damage Issues

All the discussion to this point establishes NGI's right to a summary judgment as to Guarantors' liability on Count I. That however is not all the relief NGI seeks: It asks for what it calls "partial summary judgment" on that count, by which it means a determination Guarantors owe NGI not less than $189,771.16 (the claimed figure as of September 1, 1979).

That reflects a misperception of Rule 56(a) (emphasis added):

> A party seeking to recover upon a claim ... may ... move ... for a summary judgment in his favor upon all *or any part thereof.*

That language does not permit the piecemealing of a single claim—in this case, the claim under the Guaranty Agreement—simply by dividing it into different time periods. See 10A Wright, Miller & Kane, *Federal Practice and Procedure: Civil 2d* § 2737, at 457 (1983); 6 (Pt. 2) Moore & Wicker, *Moore's Federal Practice* ¶ 56.-20[3–2], at 56–1219 (1985); *Biggins v. Olt-*

*mer Iron Works*, 154 F.2d 214 (7th Cir. 1946).

Under the circumstances this Court might well end this opinion here, leaving all damage-related issues to abide the event. But because the parties have briefed two of those issues and they will have to be dealt with in any case, this opinion goes on to resolve them.

### 1. *Asserted 2% Limit on Guarantors' Obligation*

■ Guarantors contend their obligation was to make up only the 2% difference between the anticipated SIEX-imposed 3% royalty limit and the 5% demanded by NGI. That argument could be viewed as dependent on Guarantors' ability to demonstrate the Guaranty Agreement was intended to be merely an adjunct to the License Agreement. But this Court has ruled the Guaranty Agreement took effect *before* approval of the License Agreement. On the suggested reading of Guarantors' argument, the ruling as to effective date would also mandate a finding Guarantors were liable for the full 5% royalty payment.

Moreover, even given the intention Guarantors now assert, they must fail. Their contention is flatly inconsistent with the Guaranty Agreement's unconditional language that Guarantors (emphasis added):

> guarantee the *payment* to Newman-Green, Inc. of an amount of money *up to the 5% royalty* set forth in the license agreement and for the period of time specified in the license agreement.

Given that unequivocal language, all the principles of contract law prevent Guarantors from cutting back their liability by an unexpressed limiting condition.

**8.** Given the author, that adjective might be viewed as tautological. Though Justice Holmes' penchant for brevity sometimes generated as many problems for later opinion writers as today's extended exegeses by the Supreme Court, a look at three Holmes opinions occupying a *total* of seven pages (!) in the United States Reports is bound to stimulate nostalgia for a return to the good old days.

### 2. *Applicable Exchange Rate*

Over the past few years the value of the bolivar vis-a-vis the dollar has dropped. That produces a frequently-seen kind of dispute that (like more typical·choice-of-law issues) lawyers usually first encounter in law school conflict of laws courses:

1. NGI contends the exchange rate to be used in converting Guarantors' obligations into dollars is the rate prevailing on the date of Guarantors' breach.

2. Guarantors argue for a "day of judgment" exchange rate.

Guarantors muddy the waters somewhat by their disingenuous assertion (Mem. 14) NGI is "rate-shopping" by arbitrarily choosing a date of breach that coincides with the bolivar's strongest position against the dollar. In fact the bolivar-dollar exchange rate remained essentially unchanged from 1973 (well before NGV came into existence) until after July 1982 (over 2½ years after NGI declared the agreements in breach and demanded payment) (Plaintiff's Statement of Undisputed Facts ¶ 23, Pl.R.Mem. 13 n. 12). Thus no need exists to fix a precise date of breach (as distinct from choosing between "date of breach" and "date of judgment" as the appropriate standard).

Both sides agree the law in this area derives from Justice Holmes' terse[8] opinions in *Hicks v. Guinness*, 269 U.S. 71, 46 S.Ct. 46, 70 L.Ed. 168 (1925) and *Deutsche Bank Filiale Nurnberg v. Humphrey*, 272 U.S. 517, 47 S.Ct. 166, 71 L.Ed. 383 (1926). First *Hicks* applied the breach-day rule where a German firm owed a debt, stated in marks and payable in the United States, to an American creditor. Then *Deutsche Bank* (over a four-judge dissent, unlike the unanimous *Hicks* opinion) applied what is now termed the judgment-day rule[9] where

**9.** In fact *Deutsche Bank* spoke not of the date of *judgment* but the date suit was *filed*. As Justice Holmes put it, 272 U.S. at 519, 47 S.Ct. at 166 (emphasis added):

> Obviously, in fact a dollar or a mark may have different values at different times but to the law that establishes it it is always the same. If the debt had been due here and the value of dollars had dropped *before suit was brought* the plaintiff could recover no more

an American depositor sued in America to recover funds deposited in a German bank. One year later Justice Holmes delivered another brief missive (again for a unanimous Court) in *Zimmermann v. Sutherland*, 274 U.S. 253, 256, 47 S.Ct. 625, 626, 71 L.Ed. 1034 (1927), distinguishing between the two earlier cases on the ground (1) the *Hicks* debt "was payable in New York and subject to American law, so that upon a breach of the contract there arose a present liability in dollars" while (2) in *Deutsche Bank* the debt arose under German law and was payable in Germany.

Most recently *In re Good Hope Chemical Corp.*, 747 F.2d 806, 810–11 (1st Cir. 1984), *cert. denied sub nom. Good Hope Chemical Corp. Creditors' Committee v. Koerver & Lersch*, —— U.S. ——, 105 S.Ct. 2328, 85 L.Ed.2d 845 (1985) discussed the disparate approaches that have evolved from *Hicks* and *Deutsche Bank*. One line of cases looks mechanically to the place of payment, applying the breach-day rule when payment is due in the United States and the judgment-day rule when it is due in a foreign country. By contrast, a second line of cases looks instead to the jurisdiction in which the cause of action arises, applying the breach-day rule if the claim arises under American law and the judgment-day rule if it arises under foreign law. *Good Hope*, 747 F.2d at 811 opted for the second approach.

 Whichever of those formulations is applied here, the breach-day rule plainly comes into play:

1. As already indicated, the main reason the Guaranty Agreement is shorter than even a Holmes opinion is that it refers to the License Agreement for definition. License Agreement ¶ X specifies royalty payments are to be made in the United States in dollars.[10] And if the Guaranty Agreement were looked at separately, it would lead to the same conclusion: Though Guarantors simply "agree that they guarantee the payment to [NGI]," the same sentence identifies NGI's location as Addison, Illinois (the plain implication being payment is to be made there).

2. NGI's action under the Guaranty Agreement clearly "arises under American law": That Agreement contains express recitals subjecting Guarantors to Illinois jurisdiction and choosing Illinois law for interpretation (and, this Court has held, enforcement—see n. 3) of its terms.

Guarantors offer neither case law nor cogent arguments that would call for application of the judgment-day rule, when every relevant standard refers to Illinois.[11]

### Conclusion

There is no genuine issue of fact as to Guarantors' *liability* on Count I, and NGI is entitled to a judgment as to liability on that Count as a matter of law. As for the amount of that liability, this Court has insufficient facts for a determination, but it rules Guarantors' obligation in dollars is to be calculated according to the bolivar-dollar exchange rate in effect on the date of Guarantors' breach.

dollars on that account. A foreign debtor should be no worse off.

And the last sentence in his opinion read (*id.* at 520, 47 S.Ct. at 167) (emphasis added):

Here we are lending our Courts to enforce an obligation (as we should put it, to pay damages,) arising from German law alone and ought to enforce no greater obligation than exists by that law at the moment *when the suit is brought.*

Were that in fact the operative rule, it is not clear just what the parties' dispute would be, for no information has been provided as to the December 28, 1982 exchange rate. However, little logic would seem to support a lawsuit

filing date, and this opinion (like others) will treat the alternatives in breach-day and judgment-day terms.

**10.** License Agreement ¶ XIV provides if it becomes impossible to make payments in the United States, NGV is to convert the royalty payments to *dollars* and deposit them in a Venezuelan bank.

**11.** Perhaps needless to say, the fact NGV kept its books (including a purely internal bookkeeping reserve for the unpaid royalties) in terms of bolivares instead of dollars has absolutely no bearing on this issue.

## APPENDIX A

### MEMORANDUM OPINION AND ORDER

Newman-Green, Inc. ("NGI") has charged Newman-Green de Venezuela ("NGV") and NGV shareholders Alejandro Alfonzo-Larrain R., Irene Larrain de Caplan, Rafael Tudela, Alberto Tudela and William Bettison (collectively "Guarantors"[1]) with violations of various agreements involving NGV's manufacture and sales in Venezuela of NGI's patented aerosol valves. Guarantors now move under Fed.R.Civ.P. ("Rule") 56 for summary judgment as to Count I of NGI's Amended Complaint. For the reasons stated in this memorandum opinion and order, their motion is denied.

### Facts

NGI, an Illinois corporation, has manufactured and sold patented aerosol valves for at least 30 years (NGI President Edward H. Green, Sr. Affidavit ["Green Aff."] ¶ 1). During the early 1970's NGI developed a business relationship with Guarantors out of a mutual desire to organize a Venezuelan company to manufacture and sell Newman-Green aerosol valves in Venezuela under an exclusive license from NGI. NGV was thus born. NGI owns 25% of NGV's capital stock, and Guarantors own the rest either directly or indirectly.

Following negotiations in both Illinois and Venezuela (Pl.Mem. 4), on June 13, 1974 NGI and NGV entered into a License Agreement (Def.Ex. A). Because of then-recently-enacted Venezuelan legislation, the parties recognized the License Agreement would not become enforceable unless and until it was approved by SIEX, an administrative arm of the Venezuelan government (see Pl.Ex. A). NGV and Guarantors did not want to delay commencement of operations until approval was obtained (in which respect the lack of any SIEX track record made the timetable uncertain), while NGI was unwilling to risk any sale of its machinery or any provision of know-how to NGV absent further contractual assurances (Green Aff. ¶ 4). That gap was bridged by NGV's and Guarantors' tendering of two additional letter agreements:

1. NGV's Confidentiality Agreement (App. A) ensuring protection of NGI's trade secrets; and

2. Guarantors' Guaranty Agreement (App. B)[2] ensuring payment of royalties to NGI.

Both agreements were executed July 11, 1974. NGV president Alberto Tudela had drafted the Confidentiality Agreement, while it appears NGI attorney Perry Carvellas (Def.R.Mem. 9) had drafted the Guaranty Agreement.

After the Confidentiality Agreement and Guaranty Agreement were signed, NGI began performance by:

1. selling NGV valve-assembly machinery and valve components; and

2. providing technical training and assistance to NGV, both at NGI's Illinois plant and NGV's Venezuelan plant.

NGV began manufacturing and selling aerosol valves July 1, 1975. Between 1975 and 1980 NGV's sales revenue from the valves exceeded $7 million.

SIEX never approved the License Agreement. In December 1977 SIEX indicated it would do so with substantial modifications (Def.Ex. 4), but NGI found the changes unacceptable and they were never made.

---

1. Though the text refers to those individual defendants as "Guarantors," citations to their memoranda and exhibits will take the more simplified form "Def. Mem.," "Def. R. Mem." and "Def. Ex."

2. Although the parties' memoranda use the spelling "Guarantee Agreement," the document itself bears no caption (it is in the form of a letter), and its body contains the word "guarantee" only once—used properly as a transitive verb. This opinion follows this Court's customary usage of "guaranty" as a noun (or adjectival noun) and "guarantee" as a transitive verb. See the listing in Webster's Third New International Dictionary 1007 for "guarantee" as an alternate spelling of the noun (Webster's indicates the "ee" ending, when used for the noun, is probably a bastardization of the correct "y" ending, the alteration stemming from a false analogy to such words as "assignee" and "lessee").

Despite its large sales volume, NGV never made any royalty payments to NGI. NGV apparently created a reserve fund for that purpose (Def.Ex. 5), but largely because of the SIEX problem the parties never worked out a mutually acceptable and legal way to transfer the funds to NGI (Def.Exs. 5, 7, 8).

On January 25, 1979 NGI terminated and withdrew the still-unapproved License Agreement and also terminated its relationship with NGV. NGV continued to manufacture and sell the aerosol valves until May 1980. Because NGI never received royalty payments from NGV, NGI demanded royalty payments of approximately $350,000 from Guarantors pursuant to the Guaranty Agreement. Guarantors have refused, and NGI seeks enforcement of that obligation in Count I.

Guarantors' summary judgment theory is that Venezuelan law controls the validity of the Guaranty Agreement and renders it unenforceable.[3] NGI has not disputed the outcome under Venezuelan law, contending instead that Illinois law applies and renders the Guaranty Agreement enforceable.

Appendix A

July 11, 1974

Mr. Edward H. Green, President

Newman-Green, Inc.

57 Interstate Road

Addison, Illinois 60101

U.S.A.

Re: License Agreement

Newman-Green, Inc.
Addison/Newman-Green
de Venezuela

Dear Mr. Green:

This letter is to confirm the recent discussions during which it was expressed that Newman-Green, Inc. Addison, Illinois and Newman-Green de Venezuela are desirous of entering into a license agreement whereby Newman-Green de Venezuela will be licensed to manufacture and sell Newman-Green aerosol valves in Venezuela. Pursuant to the discussions a license agreement was signed on June 13, 1974. It is understood that because of recent enacted legislation in Venezuela the license agreement will not become enforceable until such time as the provisions of the agreement are approved by the Venezuelan Government.

In consideration of the covenants herein entered into between the parties, it is agreed that pending the approval of said license agreement that Newman-Green, Inc. will undertake to provide to Newman-Green de Venezuela aerosol valve assembly machinery embodying the proprietary, confidential and technical information and know-how of Newman-Green, Inc. It is further agreed that Newman-Green, Inc., will provide additional proprietary, confidential and technical information and know-how of Newman-Green, Inc. to a designated employee of Newman-Green de Venezuela. The additional information is to be such that it will be sufficient to allow start-up and operation of the valve assembly machinery provided to Newman-Green de Venezuela. The amount and sufficiency of the additional information is to be determined by Newman-Green, Inc. It is understood and agreed that all of the aforesaid information is provided in confidence and under the terms and conditions of the license agreement.

It is further agreed, in the event that for any reason the license agreement is not approved by the Venezuelan Government, that the confidentiality provisions and the termination and/or cancellation provisions of the license agreement are in full force and effect.

This agreement is to be interpreted under the laws of the State of Illinois, U.S.A.

Signed at Caracas, Venezuela.

NEWMAN–GREEN DE VENEZUELA

By: Alberto Tudela

3. Guarantors first point to Venezuela Civil Code Article 1.805:

A guaranty may not be undertaken except in order to guarantee a valid obligation.

Their Mem. 19 then cites various commentaries on Venezuelan law to the effect that a guaranty cannot stand as a separate obligation and is thus invalid whenever, as here, the principal obligation is invalid.

1444

Alberto Tudela
President

Appendix B

July 11, 1974

Mr. Edward H. Green, President

Newman-Green, Inc.

57 Interstate Road

Addison, Illinois 60101

·U.S.A.

Re: Newman-Green, Inc. and
Newman-Green de Venezuela
License Agreement

Dear Mr. Green:

In consideration for the execution of the license agreement dated June 13, 1974 from Newman-Green, Inc., Addison, Illinois to Newman-Green de Venezuela, the undersigned personally, individually and/or collectively agree that they guarantee the payment to Newman-Green, Inc. of an amount of money up to the 5% royalty set forth in the license agreement and for the period of time specified in the license agreement.

For the purposes of this agreement the undersigned agree by virtue of the license agreement between Newman-Green, Inc. and Newman-Green de Venezuela that they are doing business in Addison, Illinois and designate as their individual and collective agent for service John E. Waghorne, Esq., Ace Avenue and Lake Street, Addison, Illinois 60101. The designation of agent is not revocable without the written consent of Newman-Green, Inc., Addison, Illinois.

The agreement is to be interpreted in accordance with the laws of the State of Illinois.

The effective date of this agreement is July 11, 1974.

Signed at Caracas, Venezuela.

/s/ Rafael Tudela
Rafael Tudela
Apartado 59053

/s/ William Bettison
William Bettison
Apartado 1286

/s/ Alberto Tudela
Alberto Tudela
Apartado 68658

/s/ Irene Caplan
Mrs. M. Caplan
Apartado 1286

/s/ A. Alfonzo-Larrain
A. Alfonzo-Larrain
Apartado 1286

Rafael Tudela
Address:

Avda. Las Ciencias c/ Edison
Edif. Edison, Piso 1
Los Chaguaramos
Caracas.-

Alberto Tudela
Address:

Centro Plaza, Piso 7, Torre B
Avda. Francisco de Miranda
Los Palos Grandes
Caracas.-

A. Alfonzo-Larrain R.
Address:

Edif. Aldemo, Piso 6
Avenida Venezuela, El Rosal
Caracas.-

William L. Bettison
Address:

Edif. Helados Club
Calle Las Mercedes,
Chacao
Caracas.-

Irene Larrain de Caplan
Address:

Calle vuelta del Zorro
Quinta Escondida
Valle Arriva
Caracas.-