# Illinois Official Reports

## Appellate Court

<div style="border:1px solid">

### *In re Estate of Adames*, 2020 IL App (1st) 190573

</div>

| | |
|---|---|
| Appellate Court Caption | *In re* ESTATE OF FERMIN G. ADAMES, Deceased (Fermin A. Adames, Petitioner-Appellee, v. Lawrence Florey, as Trustee of the Kyle Adames Trust; Janell Adames; Kyle Adames; Maquis Tolari; Leo Adames; Jennifer Smith; and John Mohan, Executor, Respondents (Lawrence Florey, Janell Adames, and Kyle Adams, Respondents-Appellants; Maquis Tolari, Leo Adames, Jennifer Smith, and John Mohan, Respondents-Appellees)). |
| District & No. | First District, Second Division<br>No. 1-19-0573 |
| Filed | October 20, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-P-958; the Hon. Patrick Murphy, Judge, presiding. |
| Judgment | Reversed. |
| Counsel on Appeal | James E. Dahl and Christopher J. Miller, of Dahl & Bonadies, LLC, of Chicago, for appellants.<br><br>Joseph D. Newbold, Christa D. Wittenberg, and Joseph E. Gumina, of O'Neil, Cannon, Hollman, DeJong & Laing S.C., of Milwaukee, Wisconsin, for appellee Fermin A. Adames. |

Jared R. Cloud, Jeanette S. Hunter, and Agnieszka Kawecki, of McDermott Will & Emery LLP, of Chicago, for appellee John Mohan.

No brief filed for other appellees.

Panel   JUSTICE COBBS delivered the judgment of the court, with opinion. Presiding Justice Fitzgerald Smith and Justice Pucinski concurred in the judgment, with opinion.


## OPINION

¶ 1   Respondents-appellants, Lawrence Florey (Florey), Kyles Adames (Kyle), and Janell Adames (Janell), appeal from the judgment of the circuit court granting a motion by petitioner-appellee Fermin A. Adames (Fermin Jr.) to enforce a settlement agreement pertaining to the estate of Fermin G. Adames. On appeal, respondents argue that the circuit court erred in enforcing the settlement agreement where (1) John Mohan (Mohan), as executor and successor trustee of the Fermin G. Adames Trust (Decedent's Trust), repudiated his obligations under the settlement documents by proposing an additional agreement; (2) Florey, as trustee of the Kyle Adames Trust (Kyle's Trust), did not participate in the settlement negotiations nor sign the settlement agreement and related documents; (3) the validity of the settlement documents was contingent upon their execution and delivery; and (4) the settlement agreement violated the statute of frauds. For the reasons that follow, we reverse.

¶ 2                          I. BACKGROUND
¶ 3   On January 29, 2012, decedent Fermin G. Adames passed away. Decedent was previously married to Leslie Adames (Leslie). Following his divorce from Leslie, decedent married Janell. Decedent had three children: Fermin Jr., Maquis Tolari (Maquis), and Kyle.[1] Decedent also had at least one niece and one nephew, Jennifer Smith (Jennifer) and Leo Adames (Leo).

¶ 4                     A. Decedent's Will and Trust
¶ 5   Prior to his death, on August 4, 2008, decedent executed a will. Pursuant to "Article Sixth" of the will, Mohan was appointed as the executor. The will "poured over" the residue of decedent's estate, after specific bequests, into Decedent's Trust.[2]

¶ 6   Decedent's Trust provided for a distribution of the residue of the estate, which included (1) 100% of the stock in Tempco Electric Heater Corporation (Tempco) and (2) 100% of the interest in two parcels of real estate located at 607 and 610 North Central Avenue in Wood

---

[1]Fermin Jr. and Maquis were decedent's children from his first marriage. Kyle, born on June 11, 1997, was decedent's child from his marriage to Janell.

[2]Decedent's Trust was governed by a Trust Agreement dated October 17, 2005. The Trust Agreement was later restated and amended on August 4, 2008.

- 2 -

Dale, Illinois (Properties), which were leased by Tempco. The distribution of the Tempco stock was directed as follows: 52% to Fermin Jr.; 21% to Kyle, held in Kyle's Trust; 21% to Maquis; 3% to Jennifer; and 3% to Leo. Decedent's Trust also provided for the distribution of the Properties: 40% to Janell, held in trust (Marital Trust); 20% to Fermin Jr.; 20% to Kyle, held in Kyle's Trust; and 20% to Maquis.

¶ 7 The agreement for Decedent's Trust stated that Kyle's shares were to be "held by a trustee and administered as set forth in Article Sixth." Pursuant to "Article Sixth" of the agreement for Decedent's Trust, the income from Kyle's shares were to be paid to him in "convenient installments, at least quarterly" during his lifetime or until there was complete distribution of the shares. The agreement for Decedent's Trust also reserved for the trustee the ability to "pay to or on behalf of Kyle such sums from the principal of his share as the trustee deems necessary or advisable from time to time for [Kyle's] heath, maintenance in reasonable comfort, education (including postgraduate) and best interests." Additionally, Kyle could withdraw "any part" of the principal of his shares at any time after reaching the age of 25. However, such withdrawal could "not exceed in the aggregate ½ in value thereof prior to reaching the age of 30 years."

¶ 8 Similarly, the agreement for Decedent's Trust provides that Janell's shares be "held by a trustee" of the Marital Trust and "administered as set forth in Article Fifth." Pursuant to "Article Fifth," Janell would receive income from the trust in "convenient installments, at least quarterly" during her lifetime, and the trustee may pay Janell "such sums from principal as the trustee deems necessary *** for her health, maintenance in reasonable comfort, and best interests, considering her income from all sources known to the trustee."

¶ 9 Lastly, the agreement for Decedent's Trust provided that decedent was to serve as trustee of Decedent's Trust during his lifetime. In the event of decedent's death, resignation, or inability to manage affairs, the agreement designated Mohan as the trustee. Edmund P. Burke was designated as successor trustee to Mohan, and "Harris, N.A." was designated as Burke's successor trustee. The agreement provided that, in the event of "resignation, refusal or inability to act of the last successor trustee," decedent, "if living, otherwise the beneficiary or a majority in interest of the beneficiaries then entitled to receive or have the benefit of the income from[ the trust" would have the power to appoint another successor trustee.[3]

¶ 10 B. Verified Petitions

¶ 11 On February 29, 2012, the will was admitted to probate, and "letters of office" were issued to Mohan "as independent executor."[4] On October 4, 2016, Mohan, through counsel, notified Tempco as well as the beneficiaries that he intended to file with the probate court "documents necessary to request approval to distribute the assets of the Estate and Trust to the beneficiaries,

---

[3]By August 2017, the designated individuals declined to act as trustee of the subtrusts created by the agreement for Decedent's Trust. As such, Florey was later appointed as the trustee of Kyle's Trust, and Kevin White was appointed as the trustee of the Marital Trust.

[4]For approximately four years after the will was admitted to probate, the estate was involved in protracted litigation with J.P. Morgan Chase, N.A. (Chase Bank). The suit involved a collection claim against the estate for an outstanding amount due under a letter of credit issued to decedent and Tempco. On July 6, 2017, Chase Bank filed a satisfaction of claim, which stated that it received payment in full. No other issues or claims pertaining to the estate or trust were presented to the court.

close the Estate and discharge Mr. Mohan." According to Mohan, such filing was necessary, as efforts to arrange a settlement among the parties regarding both the estate and the trust had failed. Specifically, Mohan provided that, since 2015, several drafts of a proposed term sheet were circulated but the parties were unable to resolve the issues in a "mutually amicable way and/or [failed to] respond to requests for feedback."

¶ 12      On December 2, 2016, Mohan as executor of the estate and successor trustee of Decedent's Trust concurrently filed a "Verified Petition For Approval of Plan of Distribution and Exoneration of Executor and Trustee" and "Verified Petition For Approval of Interim Accounts" (collectively, the Verified Petitions).

¶ 13      The distribution petition provided that, "[a]s of the date of Decedent's Death, the Estate and the Trust did not have sufficient cash or marketable securities" to pay decedent's "outstanding debts." The petition further stated that because of this, the estate was left with no residue given that "all of Decedent's assets not specifically bequeathed [would be] used to pay Decedent's outstanding debts, federal, and Illinois estate taxes, administration expenses and federal and state income taxes." The distribution petition sought the court's approval of Mohan's proposed plan of distribution of the estate's remaining assets as well as an entry of an order "[e]xonerating [Mohan], as executor of the Estate and as trustee of the Trust, for the period beginning with the date of [Decedent's death] and continuing up to and including the completion of all distributions."

¶ 14      The interim accounts petition, on the other hand, noted that Tempco made substantial distributions to the estate so that the estate could pay the outstanding debts, including "federal and Illinois estate tax bills, federal and state income tax bills and administration expenses in full." The interim accounts petition sought approval of Mohan's accounts for his administration of the estate and his accountings of receipt and disbursements of the estate from January 29, 2012, through November 30, 2016.

¶ 15      Janell and Kyle, through counsel, subsequently filed a motion for leave to take discovery and set a briefing schedule on the petitions, arguing that discovery was proper given that Mohan refused to provide financial information necessary to evaluate the proposed accounting of the estate. Janell and Kyle also argued, *inter alia*, that the petitions were premature because (1) the distribution petition acknowledged that Mohan did not fully discharge his duties with respect to the estate's tax obligations and (2) Mohan refused to cooperate with them regarding the proposed accounting for the estate and their requests for additional information pertaining to expenditures.

¶ 16      On January 4, 2017, the circuit court ordered the parties to engage in informal discovery, subject to entry of a protective order. On July 31, 2017, Janell, Kyle, and Fermin Jr. filed objections to Mohan's accounting. In its June 25, 2018, order, the circuit court ruled on the objections and ordered Mohan to file a final accounting and amended plan of distribution. On July 12, 2018, Mohan timely filed the final accounting and amended plan of distribution.

¶ 17                 C. Settlement Negotiations and Agreement

¶ 18      In July 2018, the parties, via e-mail, confirmed reaching an "agreement in principle" on the terms governing the amount of distribution and dividend payments to Tempco's shareholders. The e-mail exchange showed that the parties agreed, *inter alia*, that (1) no transfers of Tempco's shares would be made for a period of five years following the execution of the settlement agreement, (2) the shareholders for Tempco would each receive distributions

sufficient to satisfy the tax liability owed by each shareholder, (3) Kyle and his trustee would not sell Kyle's shares for a period of five years following the agreement's execution, (4) Kyle would annually receive Tempco's audited financial statements and the corporation's tax returns if he signs a confidentiality agreement, (5) an agent acting on behalf of Kyle or the trustee holding Kyle's shares would also be subject to the confidentiality agreement if either receives the financial statements or the tax returns, and (6) Tempco and the executor would sign two 10-year leases, under which Tempco has the obligation to make monthly rental payments for leasing the Properties.

¶ 19    On August 10, 2018, the parties, including Janell and Kyle through attorney Vance L. Liebman, filed a joint motion informing the court of this "agreement in principle," which was "memorialized in email form *** subject to agreement on final documentation." According to the parties, this agreement "resolve[d] the issues related to the parties' objections and [would] permit the distribution of the estate." The motion further requested the court for an extension of time to file objections to the accounting submitted by Mohan on July 12, 2018, and to "reschedule the deadline only if necessary at the hearing on August 20, 2018 to allow time [to] finalize the written documents necessary to effectuate [the] settlement." The circuit court granted the extension and continued all pending matters. The court also ordered the parties to "report to the court on the final settlement and the timetable for the distribution of the Estate's assets."

¶ 20    In August 2018, attorney Liebman received information that Florey was selected as the new trustee of Kyle's Trust. On August 18, 2018, attorney Liebman e-mailed Florey regarding the status of the ongoing settlement negotiations. The e-mail also provided that Florey would receive appointment paperwork if he chose to accept the role of trustee. A few days later, on August 20, 2018, Florey e-mailed attorney Liebman that he was "glad to help as Kyle's trustee." On or about August 22, 2018, Florey was appointed as trustee of Kyle's Trust, and the appointment document was forwarded to Mohan's counsel via e-mail.

¶ 21    On September 3, 2018, attorney Liebman e-mailed copies of the draft settlement documents that were previously exchanged by the parties to Florey. On September 4, 2018, Mohan's counsel revised and circulated, via e-mail, the final draft of the settlement documents for approval. On September 25, 2018, Mohan's counsel informed the parties' counsel that the settlement documents were being sent via FedEx that day for their clients' signature. The settlement documents were signed by Jennifer, Maquis, Fermin Jr., Tempco, Mohan, and the trustee of Janell's Marital Trust. The documents were also signed by Janell and Kyle, who then sent them to Florey. In a subsequent e-mail to the parties' counsel, attorney Paul M. King, a colleague of attorney Liebman, stated that they had "been working with [Florey] to answer all his questions regarding the documents" and "anticipate[d] receiving the final trustee signature along with Janell and Kyle's signature." Leo, on the other hand, did not sign the agreement but agreed to execute the settlement agreement via e-mail to Mohan's counsel and did not raise any objections to the agreement in later court proceedings.

¶ 22    On October 7, 2018, after copies of the settlement documents had already been sent, Mohan's counsel e-mailed the parties' counsel regarding his concern with the estate's income tax obligations pertaining to the Properties. Mohan's counsel sent another follow-up e-mail on October 24, 2018, with a proposed real estate tax payment agreement. On October 25, 2018, Florey, through counsel James E. Dahl, entered his appearance before the circuit court. On November 9, 2018, attorney Liebman e-mailed parties' counsel regarding the status of Janell

and Kyle's signed documents. In his e-mail, attorney Liebman reiterated that Janell and Kyle had sent the signed documents to Florey, who hired attorney Dahl as counsel to review them. Attorney Liebman further provided that he had a meeting scheduled with attorney Dahl the following week "to get things wrapped up shortly." On December 12, 2018, attorney Dahl sent an e-mail to Fermin Jr.'s counsel noting that Florey was "not prepared to agree to the terms of the proposed settlement agreement" and "will proceed with the case before the judge to whom it is now assigned." No further explanation was provided.

### D. Motion to Enforce Settlement

On January 7, 2019, Fermin Jr. filed a motion to enforce settlement or, in the alternative, for a release of shares. The motion sought relief in the form of an order by the circuit court binding the parties to the terms of the settlement documents. These settlement documents included (1) the settlement agreement and mutual release, (2) the shareholder agreement, (3) the confidentiality agreement, (4) the fourth amendment to the lease for 610 Central Avenue, and (5) the fourth amendment to the lease for 607 Central Avenue. The motion also requested the court to direct the executor to distribute the estate's assets in accordance with the settlement documents or, alternatively, to make an immediate, interim distribution of shares.

Janell and Kyle filed a joint response in opposition to the motion, and Florey and Mohan filed their own separate responses.[5]

### 1. Janell and Kyle's Joint Response

Janell and Kyle responded that the settlement agreement was not enforceable because (1) a condition precedent to its enforcement was the signature of all parties and, without Florey's signature, the settlement agreement was not binding and (2) Mohan's attempt to modify the draft agreement as to certain future income tax liabilities withdrew the draft agreement or led to its repudiation. Janell and Kyle further argued that the statute of frauds (740 ILCS 80/0.01 *et seq.* (West 2018)) bars enforcement because the draft agreement included a 10-year lease, a confidentiality agreement that required performance for an indefinite period, and a shareholder agreement with covenants extending for more than 5 years, which requires signature by all parties. With regards to the alternative relief seeking distribution of Tempco stocks, Janell and Kyle argued it should not be granted because such "piecemeal distribution" of the estate's assets would not benefit the remaining beneficiaries, as it was "phrased so as to require the beneficiaries of the Tempco stock to continue the taxation as an S Corp without any obligation on Tempco to distribute money to the owners to pay their taxes." Instead of a "piecemeal distribution," Janell and Kyle argued that the distribution "should go through an orderly process with all of the assets distributed and no conditions imposed on distribution other than those stated in the Will and Trust."

### 2. Florey's Response and Affidavit

In his response, Florey argued that the motion should be denied because (1) he is an essential party to the settlement and never agreed to it, (2) although Kyle and Janell signed the settlement agreement, they "sent it to Florey with the instruction that Florey not deliver the

---

[5]No response objecting to the motion was filed by the other parties to the suit.

signed agreement to anyone unless he [believed that entering a] settlement agreement was in Kyle's best interests," and (3) the settlement violated the statute of frauds. Lastly, Florey argued that Fermin Jr.'s alternative request for an order directing Mohan to make an immediate distribution of Tempco Stock should be denied because (1) not all the beneficiaries of the Tempco Stock were in agreement with the distribution and (2) Fermin Jr. was essentially requesting for a "complete distribution" of Tempco's stock, which was contrary to the beneficiaries' request for interim distributions of a portion of the rent that had been collected for the past seven years but was not distributed.

¶ 30        In support of his response, Florey submitted an affidavit in which he averred that, in his capacity as trustee of Kyle's Trust, he never communicated with Fermin Jr. or his counsel regarding the purported settlement and never engaged in any negotiations pertaining to it. Florey also never approved or agreed to the proposed settlement documents and did not represent to any other beneficiary or their counsel that he approved or agreed to the proposed settlement documents. Florey was not represented by attorney Liebman, who served as Kyle's counsel. Florey also never granted authority to attorney Liebman to make statements or agree to the terms of a settlement on Florey's behalf.

¶ 31        Florey further averred that he "received copies of the settlement documents signed by both Kyle and [Janell] with their instruction that, if [Florey] did not believe that the terms of the Settlement Documents were in Kyle's best interest, then [he] was to keep the Settlement Documents signed by Kyle and [Janell] and not deliver them to anyone." Additionally, the affidavit stated, without further explanation, that Florey "object[ed] to the terms of the settlement reflected in the settlement documents because, in [his] judgment, the terms of the Settlement Documents were not in Kyle's best interests." As such, Florey did not agree to be "bound by the terms of the Settlement Documents" and never signed nor delivered these settlement documents to anyone. Lastly, the affidavit provided that Florey had retained separate counsel to represent him in his capacity as trustee of Kyle's Trust in this case.

¶ 32                                          3. Mohan's Response

¶ 33        Mohan, in his capacities as the executor and successor trustee of Decedent's Trust, also responded to Fermin Jr.'s motion. Although Mohan did not oppose the motion to the extent that it sought enforcement of the settlement agreement, he did oppose the motion's alternative prayer for relief seeking an immediate, interim distribution of Tempco shares to the beneficiaries. First, Mohan argued that it would be "imprudent" for him to make an interim distribution of any kind because it was "impossible for [him] to predict with accuracy the future cash needs of the Estate." This was due to the continued administration of the estate for "nearly seven years after Decedent's death" and the "unnecessary litigation" engaged by the parties in interest. According to Mohan, "[d]istribution of the Tempco Shares, the most valuable asset of the Estate, [would] leave [him] without sufficient assets to pay expenses associated with the [Estate's] continued administration."

¶ 34        Second, Mohan argued that distribution of one asset (*i.e.*, Tempco Shares) and not the others (*i.e.*, real estate interests and cash) would result in Fermin Jr. receiving 52% of Tempco shares, which would make him the majority shareholder. According to Mohan, this distribution would only benefit Fermin Jr. and would not provide any meaningful benefit to the other beneficiaries. Lastly, Mohan asserted that it was important for the court to note the change in Tempco's tax status if a distribution was made. According to Mohan, Florey or Kyle would

only have a short period of time after distribution of shares to file an election with the Internal Revenue Service permitting Kyle's Trust to qualify as a shareholder of a corporation taxed as an S corporation. In the event that Kyle's Trust did not qualify, Tempco would "revert to being taxed as a C Corporation, which may have a significant financial impact on the company and its shareholders." Mohan also briefly clarified that Tempco did not "advance" funds or make a loan to the estate but rather made "distributions to the Estate, which the Executor used to pay taxes and expenses of administration of the Estate."

¶ 35                            4. Reply and Joint Motion to Supplement Record

¶ 36        On January 29, 2019, Fermin Jr. filed his reply in support of his motion. In response to Fermin Jr.'s reply, respondents filed a joint motion to supplement the record on Fermin Jr.'s motion on February 5, 2019. The joint motion corrected the record with respect to allegations Fermin Jr. made in his reply that Florey accepted his role as trustee of Kyle's Trust as early as February 2018. The circuit court granted the motion.

¶ 37                                    E. Circuit Court Order

¶ 38        On February 25, 2019, the circuit court entered an order granting Fermin Jr.'s motion to enforce the settlement. The court held that the settlement agreement was not rendered unenforceable by the fact that Florey did not sign it. The court found that Florey's signature was not required because he was not a necessary and indispensable party to the settlement agreement. Similarly, the court rejected respondents' statute of frauds argument on the basis that Florey was not a necessary party. The court also noted that no condition precedent existed that all parties sign the settlement agreement. Lastly, the court rejected the argument that Mohan's attempt to modify the draft agreement with respect to certain future income tax liabilities amounted to repudiation of the agreement.

¶ 39                                        II. ANALYSIS

¶ 40        On appeal, respondents argue that the circuit court erred in entering its February 25, 2019, order, granting Fermin Jr.'s motion to enforce settlement and binding the parties to the settlement agreement and related settlement documents. Respondents contend that the circuit court's decision was erroneous because (1) Mohan, as executor and successor trustee of Decedent's Trust, repudiated the settlement agreement; (2) Florey, as trustee of Kyle's Trust, never agreed to the settlement nor signed the settlement agreement and related documents; (3) the validity of the settlement documents was contingent upon its execution and delivery; and (4) the settlement agreement violated the statute of frauds.[6]

¶ 41                                    A. Standard of Review

¶ 42        Prior to addressing respondents' claims, we look to the standard of review governing enforcement of settlements. Where a trial court's decision to grant the "enforcement of a settlement agreement [is] made on the motion pleadings and attachments, without holding an

_____

[6]In his separately filed brief, Mohan states that he neither supported nor opposed the motion to enforce the agreement in the circuit court proceedings. In this appeal, he takes no position as to whether the decision of the circuit court should be affirmed or reversed and limits his argument to the issue of repudiation.

evidentiary hearing, [our review is] *de novo*." *City of Chicago v. Ramirez*, 366 Ill. App. 3d 935, 946 (2006). Here, the parties do not argue that the circuit court conducted an evidentiary hearing, nor does the record on appeal indicate that an evidentiary hearing was held. Therefore, our review is *de novo*.

¶ 43    Generally, courts of equity favor the settlement of disputes among family members " 'by agreement rather than by resort to law.' " *In re Marriage of Asta*, 2016 IL App (2d) 150160, ¶ 21 (quoting *Wolf v. Uhlemann*, 325 Ill. 165, 183 (1927)). " 'Where there is a reasonable or substantial basis for the belief or assurance that prolonged and expensive litigation will result over the proceeds or distribution of an estate, that the estate will be materially depleted, and that the family relationship will be torn asunder, the parties interested therein are warranted in preventing such *bona fide* family controversy by a settlement agreement.' " *Id.* (quoting *Wolf*, 325 Ill. at 183). Mindful of these considerations, we proceed with our analysis of the issues at hand.

¶ 44                          B. Florey's Assent and Condition Precedent

¶ 45    Respondents argue that the circuit court erred by granting Fermin Jr.'s motion to enforce the settlement because "Florey, who was named as a party and anticipated signatory to the Settlement Agreement, the Shareholders Agreement, and the Confidentiality Agreement, never agreed to the settlement generally or [to] the terms of the Settlement Documents." In support, respondents point to the introductory paragraphs of the settlement documents, which list Florey as one of the parties, and the signature line of each document, which reserves a space for his signature. Respondents contend that this "unequivocally demonstrate[s] that Florey was named as a party and intended signatory to each of the agreements."

¶ 46    Settlement agreements are governed by principles of contract law. *Rose v. Mavrakis*, 343 Ill. App. 3d 1086, 1090 (2003). A valid and enforceable contract requires an offer, acceptance, and consideration. *Sheth v. SAB Tool Supply Co.*, 2013 IL App (1st) 110156, ¶ 68 (citing *CNA International, Inc. v. Baer*, 2012 IL App (1st) 112174, ¶ 45). Failure to agree upon an essential contract term indicates that there is no mutual assent and, thus, no enforceable contract. *Rose*, 343 Ill. App. 3d at 1091. Generally, "one of the acts forming part of the execution of a written contract is its signing" as it indicates "mutuality or assent" to the terms of the agreement. (Internal quotation marks omitted.) *Hedlund & Hanley, LLC v. Board of Trustees of Community College District No. 508*, 376 Ill. App. 3d 200, 206 (2007). In the event that a written contract is unsigned, the parties' intent determines whether the contract is binding. *Id.*

¶ 47    In the present case, there is no dispute as to the existence of a written settlement agreement and settlement documents. Additionally, based on the e-mail correspondence of parties' counsel, it appears that the settlement documents were signed by all the listed signatories, except for Leo and Florey.[7] Although the absence of Leo's signature on the documents is not an issue in this case, we briefly note that Leo's intent to be bound by the agreement could be inferred based on (1) his purported e-mail to Mohan's counsel providing that he agreed to execute the settlement agreement and (2) his lack of objections to the agreement later before the circuit court. Florey, on the other hand, decided not to sign, and in fact expressly rejected the terms of the settlement agreement and documents because he determined that the settlement

---

[7]The record on appeal does not include a copy of the signed settlement agreement and documents.

would be against Kyle's best interests. Our analysis thus turns to whether Florey's assent and signature was a condition precedent to the enforcement of the agreement.

¶ 48 A condition precedent is defined as "an act that must be performed or an event that must occur before a contract becomes effective or before one party to an existing contract is obligated to perform." *Cathay Bank v. Accetturo*, 2016 IL App (1st) 152783, ¶ 32. Whether signing an instrument is a condition precedent to that instrument becoming a binding contract usually depends on the intent of the parties. *Lynge v. Kunstmann*, 94 Ill. App. 3d 689, 694 (1981). Where parties reduce the agreement to writing and its signature by them is a condition precedent to its completion, no contract will exist until that is done. *S.N. Nielsen Co. v. National Heat & Power Co.*, 32 Ill. App. 3d 941, 946 (1975).

¶ 49 Even so, "a party named in a contract may, by his acts and conduct, indicate his assent to its terms and become bound by its provisions even though he has not signed it." *Landmark Properties, Inc. v. Architects International-Chicago*, 172 Ill. App. 3d 379, 383 (1988). "Whether an act is necessary to [the] formation of the contract or the performance of an obligation under the contract depends upon the facts of the case ***." *McAnelly v. Graves*, 126 Ill. App. 3d 528, 532 (1984).

¶ 50 Respondents argue that the circuit court erred in finding that the execution of the settlement agreement by all the named parties was not a condition precedent to its enforceability. Respondents not only point to the settlement agreement, which includes a signature line for Florey and language in the introductory paragraph providing that "each signatory to this Agreement is referred to herein as a 'Party,' " but also note that the parties' conduct during negotiations clearly indicated that they considered both the execution and delivery of a formal, written settlement agreement to be a condition precedent to the enforcement of the settlement. Respondents point to numerous e-mail correspondence between the parties as well as a court appearance on August 10, 2018, where the parties filed a joint motion indicating that they reached an agreement which was "subject to agreement on final documentation." Petitioner, on the other hand, contends that the agreement is enforceable because the agreement did not expressly condition the validity of the agreement on Florey's signature or approval. Petitioner argues that the parties knew how to add language that clearly and expressly states a condition precedent and, if they intended the agreement to be fully signed, they would have added language to that effect.

¶ 51 In determining whether the signature of all parties, including Florey's, was a condition precedent, we find the Fifth District's decision in *Graebe v. Graebe*, 95 Ill. App. 3d 1144 (1981), instructive. There, the plaintiff filed suit for declaratory judgment against his brother and the family corporation, seeking to have a shareholders' agreement invalidated. *Id.* at 1145. The plaintiff and defendant negotiated the shareholders' agreement, and the defendant's wife "typed" the agreement pursuant to the defendant's instructions. *Id.* at 1147. The agreement consisted of three parts: part I reduced the number of individuals who could serve on the corporation's board of directors and removed the plaintiff's wife as the corporate officer, part II allowed the defendant to buy the remaining stock, and part III ensured that the defendant retained permanent employment with the corporation, which essentially removed the plaintiff's wife "from her position of influence in the corporation and [installed the defendant] in a position nearly equal" to the plaintiff. *Id.* The agreement included three signature lines as well as a line for the date at the bottom of the second page. *Id.* The date was handwritten as April 29, 1977, and "[t]wo of the three lines [bore] the identified signatures" of plaintiff and

defendant. *Id.* The plaintiff's wife, however, was not involved in the negotiations, nor did she sign the agreement despite her major contributions to the family corporation, which included, *inter alia¸* serving as the corporation's secretary-treasurer, providing physical labor in the development of the corporation's product, serving as the authorized person for the corporation's checking account, and cosigning on the business loans. *Id.* at 1146-47.

¶ 52    The defendant's wife testified that the third line was for a notary. *Id.* at 1147. The plaintiff, on the other hand, testified that the third line was for his wife's signature. *Id.* Both the plaintiff and his wife testified that the defendant knew that any resulting agreement pertaining to the corporation would not be valid without the approval of the plaintiff's wife. *Id.* The trial court entered judgment for the plaintiff, finding that the approval of the plaintiff's wife was a condition precedent to a valid agreement. *Id.* at 1148. The defendant appealed. *Id.* On appeal, the defendant argued that nothing in the final draft of the agreement expressly conditioned the validity of the agreement on the signature of the plaintiff's wife and, therefore, it was enforceable without her approval. *Id.* The Fifth District rejected the defendant's argument and found that the record was replete with probative facts that supported the finding that approval of the plaintiff's wife was a condition precedent to a valid agreement between the parties. *Id.* Moreover, the defendant's "knowledge and consent to the condition precedent was manifested by the third unsigned signature line appearing at the bottom of the last page of the purported agreement," which could not have served any other purpose than for the signature of the plaintiff's wife. *Id.* at 1149.

¶ 53    Here, a condition precedent was apparent from the "four corners" or the face of the agreement. See *Catholic Charities of the Archdiocese of Chicago v. Thorpe*, 318 Ill. App. 3d 304, 308 (2000) (stating that "[a]ll the Illinois cases that our research has disclosed that found a condition precedent to the formation of a contract contain express language on the face of the contract to support that construction"). The settlement agreement, shareholder agreement, and confidentiality agreement expressly identified Florey as one of the parties to the document in the introductory paragraphs. The last page of each document consisted of separate signature lines for the parties mentioned earlier in the introductory paragraphs. Unlike *Graebe*, where the shareholders' agreement simply consisted of unmarked signature lines, the documents here consisted of a line with Florey's name and title printed underneath, thus designating a specific place for Florey to sign.

¶ 54    We acknowledge Fermin Jr.'s argument that the parties knew how to add language that clearly and expressly states a condition precedent as they did with respect to a provision in the agreement pertaining to amendments, providing that "[a]ny amendment to this agreement will be effective only if it is in writing and executed by all of the parties." However, we can neither ignore language in the agreement that identifies Florey as a party to the settlement and language in the agreement providing that the "parties agree to execute" the documents, nor can we view the separate signature lines for the parties as being mere contractual verbiage or formatting error. Further, as we will later discuss, Florey served as a necessary party to the agreement given his role as trustee of Kyle's Trust. Therefore, it follows that Florey's approval was a condition precedent to any agreement affecting Kyle's Trust and his duties as a trustee. See *Graebe*, 95 Ill. App. 3d at 1148-49 (providing that it was "plain that [the plaintiff's wife's] approval was a condition precedent to any agreement affecting the future of [the corporation]" given evidence of her role in the family's corporation).

¶ 55    We further note that, although the present case did not involve a hearing or testimony of witnesses like in *Graebe*, the record before us is replete with facts, in addition to the document itself, that indicate that the signature and approval of all parties, including Florey's, served as a condition precedent to enforcement. Here, the final draft of the settlement documents was circulated to the parties, including Florey, for approval and signature; counsel for the parties consistently followed up with e-mails, including to Florey, to ensure whether the parties approved and signed the documents; and attorney Liebman and his colleague worked to address any questions from Florey and even stated that they "anticipate[d] receiving the final trustee signature along with Janell and Kyle's signature." All these facts indicate that Florey's signature was a condition precedent to completion of the contract and, in the absence of the same, no contract was formed.

¶ 56    Respondents urge as a separate argument that delivery of the signed agreement was also a condition precedent. Although delivery would be relevant on the issue of Kyle's intent, having found that Florey's approval was a condition precedent to the enforcement of the settlement agreement and that this condition was not satisfied, we need not address it. Neither do we address respondent's arguments regarding Mohan's alleged repudiation of the contract or that the contract was violative of the statute of frauds. Mindful that the parties may attempt creation and completion of a future settlement agreement, we do, therefore, consider whether Florey was a necessary party to the agreement.

¶ 57                                    C. Necessary Party

¶ 58    In addressing whether Florey was a necessary party to the settlement agreement, we look to case law, which defines the nature and duties of trustees, as well as to the Trusts and Trustees Act (Act), now known as the Illinois Trust Code, for guidance. See 760 ILCS 5/1 *et seq.* (West 2018).[8]

¶ 59    A trustee stands as the legal title holder to property which is the subject of the trust. *Kessler, Merci, & Lochner, Inc. v. Pioneer Bank & Trust Co.*, 101 Ill. App. 3d 502, 505 (1981). Generally, "the powers and duties of a trustee must be determined by the instrument creating the trust, and, by accepting the trust, the trustee becomes bound to administer it, or execute it, in accordance with the provisions of the trust instrument." *In re Hartzell's Will*, 43 Ill. App. 2d 118, 134 (1963). The trustee is entitled to possession and management of the trust property and after having accepted a trust and taking possession of the property, except for the delegation of ministerial powers or duties, the trustee has no power to delegate the trust. *Id.* at 135 (citing *Binns v. LaForge*, 191 Ill. 598 (1901)). It is the duty of the trustee to both protect and preserve the trust property from loss and injury. *Id.* at 134-35 (citing 35 Ill. L. and Prac. *Trusts* § 121 (1958)). The "care and prudence to be exercised by such trustee [in administering the trust] are those which ordinary men would exercise under like circumstances in dealing with their own affairs." *Harris Trust & Savings Bank v. Wanner*, 393 Ill. 598, 606 (1946).

¶ 60    The Act "applies to every trust created by will, deed, agreement, declaration or other instrument" and provides for the powers and duties of trustees. 760 ILCS 5/3 (West 2018).

_____

[8]The Illinois Trust Code (Code) (760 ILCS 3/101 *et seq.* (West Supp. 2019)) became effective on January 1, 2020, replacing the previous Trusts and Trustees Act, which respondents cite in their brief. Given that the relevant portions of the Act and the Code are substantially similar and the Act was in effect at the time respondents filed their appeal, we will refer to the Act.

- 12 -

Under the Act, " '[a] person establishing a trust may specify in the instrument the rights, powers, duties, limitations and immunities applicable to the trustee, beneficiary and others and those provisions where not otherwise contrary to law shall control.' " *In re Estate of Feinberg*, 235 Ill. 2d 256, 267 (2009) (quoting 760 ILCS 5/3 (West 2008)).

¶ 61    We believe that common-law principles regarding the rights and duties of trustees, as well as the Act, provide sufficient basis to conclude that Florey, the named trustee over Kyle's shares in Tempco and the Properties and the holder of legal title to both, is a necessary party to any contract that might have any present or future impact on the administration of the trust assets. Even so, respondents point to the virtual representation provision of the Act as a further demonstration that Florey's participation in the settlement agreement was necessary. See 760 ILCS 5/16.1 (West 2018). Contrarily, Fermin Jr. contends that the Act does not apply because the agreement does not govern "property held by a trust" but instead "impacts property that will eventually be held by a trust after it is distributed."

¶ 62    The doctrine of virtual representation developed in Illinois as far back as the 1800s. One of the earliest cases to recognize the doctrine, *Hale v. Hale*, 146 Ill. 227 (1893), held that the virtual representative satisfied the necessary parties rule by eliminating the necessity of joining the represented parties and by binding the represented parties, such as minors or unborn or disabled beneficiaries. *Hale* initially allowed virtual representation only in judicial actions; however, courts over time have applied the doctrine to nonjudicial settlement agreements. See, *e.g.*, *Wolf*, 325 Ill. 165 (court allowed testatrix's living grandchildren to represent unborn grandchildren in family settlement agreement). Following *Hale*, application of the doctrine was extended to living parties. See *McCampbell v. Mason*, 151 Ill. 500 (1894) (foreclosure action held to bind minor child not joined in the action because of the involvement of her five siblings, whose interests were identical to hers); see also *Longworth v. Duff*, 297 Ill. 479 (1921).

¶ 63    Section 16.1(a)(1) of the Act provides, "[t]o the extent there is no conflict of interest between the representative and the represented beneficiary *** , a beneficiary who is a minor [or a disabled or unborn person], or a beneficiary whose identity or location is unknown and not reasonably ascertainable *** , may for all purposes be represented and bound by another beneficiary having a substantially similar interest with respect to the particular question or dispute." 760 ILCS 5/16.1(a)(1) (West 2018). Section 16.1(d) provides that "[i]nterested persons *** may enter into a binding nonjudicial settlement agreement with respect to any matter involving a trust" including, *inter alia*, "[a]pproval of a trustee's report or accounting" as well as "[q]uestions relating to property or an interest in property held by the trust, provided the resolution does not conflict with a clear material purpose of the trust." *Id.* § 16.1(d)(2), (d)(4)(B), (E). The Act defines "interested persons" as "the trustee and all beneficiaries, or their respective representatives *** , whose consent or joinder would be required in order to achieve a binding settlement were the settlement to be approved by the court." *Id.* § 16.1(d)(1). Pursuant to section 16.1(d)(5) of the provision, any interested party "may request the court to approve any part or all of a nonjudicial settlement agreement." *Id.* § 16.1(d)(5). We read the virtual representation provisions and the sections cited here to require the trustee's consent to any such agreement.

¶ 64    Clearly, the agreement in this case involved matters pertaining to both the "[a]pproval of a trustee's report or accounting" as well as "[q]uestions relating to property or an interest in property held by the trust." See *id.* § 16.1(d)(4)(B), (E). Under appropriate circumstances, both

subjects would bring the agreement within the purview of the doctrine. Specifically, the settlement agreement included an "Approval for Final Accounting," stating that Mohan's final accounting was approved by all the beneficiaries. Additionally, the agreement granted Mohan authority to enter into a 10-year lease term with Tempco on the Properties, 20% of which was held in Kyle's Trust. The crucial takeaway is that, under the virtual representation doctrine, nonjudicial settlement agreements can be entered into by "interested persons," meaning "the trustee and all beneficiaries" or their representatives. See *id.* § 16.1(d)(1). We read the several provisions in the Act to mean that nonjudicial settlement agreements are enforceable if, at a minimum, they are entered into by (1) the trustee and (2) all the beneficiaries or their respective representatives.

¶ 65　　That said, and although for different reasons, we agree with Fermin Jr. that the Act's virtual representation provision has no application in this case with respect to Florey, Kyle, or Kyle's Trust, all of whom were capable of being represented on their own behalves. Nonetheless, the provision sheds some much-needed light on the issue before us. The provision makes it abundantly clear that a nonjudicial settlement agreement involving a trust, to be binding, requires the participation of the trustee. Although the statute is silent, we do not think it much of a stretch to reason that the trustee's fiduciary duty to the beneficiary, complete with liability for breach, forms the basis of that requirement. That same rationale supports our conclusion here.

¶ 66　　Fermin Jr. maintains that the circuit court's determination that Florey was not a necessary party to litigation was correctly applied to the facts of this case and should be upheld to support its finding that Florey was also not a necessary party to the settlement agreement. In determining that Florey was not a necessary party to the settlement agreement, the circuit court relied mainly on two cases, *Lain v. John Hancock Mutual Life Insurance Co.*, 79 Ill. App. 3d 264 (1979), and *American Home Assurance Co. v. Northwest Industries, Inc.*, 50 Ill. App. 3d 807 (1997), which discuss the necessary party concept in litigation.

¶ 67　　In *Lain*, this court found that a creditor was a necessary and indispensable party to a suit concerning proceeds of a life insurance policy and, therefore, was entitled to personal service of process. In doing so, this court held that "[a] necessary or indispensable party is one whose presence in the suit is required for any of three reasons: (1) to protect an interest which the absentee has in the subject matter of the controversy which would be materially affected by a judgment entered in his absence [citations]; (2) to reach a decision which will protect the interests of those who are before the court [citations]; or (3) to enable the court to make a complete determination of the controversy." *Lain*, 79 Ill. App. 3d at 268-69.

¶ 68　　In *American Home Assurance Co.*, a manufacturer of chemicals and a distributor of animal feed were sued by individuals claiming they were sold contaminated products. *American Home Assurance Co.*, 50 Ill. App. 3d at 808-09. This court found that the distributor was not a necessary party to the suit because the distributor must not only be " 'legally or equitably interested in the subject matter and the result of the suit' " but must also have a " 'present substantial interest as distinguished from a mere expectancy or future contingent interest.' " *Id.* at 812 (quoting *Oglesby v. Springfield Marine Bank*, 385 Ill. 414, 422 (1944)). By previously entering into a settlement agreement, this court found that the distributor's interest in the controversy was "at best merely a potential future interest and contingent upon the happening of certain events." *Id.* at 811.

¶ 69    Respondents contend that the circuit court's reliance on cases like *Lain* and *American Home Assurance Co.* is misplaced because the proper question in this case is not whether Florey was a necessary and indispensable party to the lawsuit to enforce the settlement agreement. We agree. The relevant inquiry here is whether Florey, as the testamentary trustee, is a necessary party to the settlement agreement, the subject of which includes property of the testamentary trust. We have not been directed to any case law providing that the necessary party analysis is the same for both legal action in which the litigants seek to identify the necessary parties to a property dispute and legal action in which the litigants seek to identify the necessary parties for the creation of a binding settlement agreement involving a trust. However, as we discuss below, our conclusion would be the same even under the necessary party to litigation test.

¶ 70    Under Illinois law, trustees are deemed to be necessary parties to actions involving trust property because they hold legal title to the trust estate. *Schmitz v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 405 Ill. App. 3d 240, 245 (2010) (providing that a trustee is generally a holder of legal title of the trust estate); see also *Illinois National Bank of Springfield v. Gwinn*, 390 Ill. 345, 356 (1945) (providing that "in all suits respecting trust property," "[t]he trustee is a necessary party because he holds the legal title," whereas "[t]he beneficiary is a necessary party because he has the equitable and ultimate interest to be affected by the decree"). Florey's status in this case is that of a trustee. As such, Florey holds a cognizable interest in the estate by virtue of his status as a trustee or holder of legal title. Additionally, as trustee, Florey is bound by the duty to protect that interest for the benefit of the beneficiary.

¶ 71    Further, as respondents argue, Florey has "an immediate legal interest in the trust estate" that would be affected by the enforcement of the settlement. See *American Home Assurance Co.*, 50 Ill. App. 3d at 812 (the party must have a "present substantial interest as distinguished from a mere expectancy or future contingent interest" (internal quotation marks omitted)). For instance, respondents contend that, by virtue of the settlement agreement, Florey would be required to enter into a shareholders' agreement that would affect his legal interests in the Tempco stock, as it would (1) prevent him from selling any Tempco stock for a period of five years, (2) restrict the manner in which he could sell Tempco's stock after the five years, (3) require him to elect to have Kyle's Trust taxed as an S corporation for tax purposes, and (4) require him to agree to a fixed dividend of 6% of Tempco's taxable income, to be split amongst Tempco's shareholders. Additionally, respondents argue that the plain language of the settlement agreement indicates that Florey's interest in Kyle's Trust would be further implicated, as he would be required to "release any and all claims which he, as Trustee" has against the other beneficiaries, Tempco, and the executor. Respondents also contend that Florey would be required to enter into a confidentiality agreement.

¶ 72    Fermin Jr. responds that each of those restrictions is a restriction on the assets that would eventually be placed in Kyle's Trust and not a restriction imposed contractually on Florey by the settlement documents. Essentially, Fermin Jr. is arguing that Florey does not have a present substantial interest because the restrictions only bind Florey to the extent that they are restrictions on the assets and do not impact Florey personally or his role as trustee. In support, Fermin Jr. points out that restrictions provided in the settlement agreement on the Tempco stock are placed even on third parties and new shareholders as if they were original parties to the agreement. Even the confidentiality and release terms included in the settlement agreement provide that it is "binding upon, enforceable against, and inures to the benefit of, the Parties

- 15 -

and their respective affiliates, successors, assigns, and representatives, agents, directors and officers according with the terms of [the] Agreement." Similarly, provisions in the shareholder agreement restricting how Tempco shares are purchased and sold and how dividends are paid on those shares are binding on the "successors, personal representatives, trustees, beneficiaries, heirs, transferees, donees and assigns of the parties." We find Fermin Jr.'s argument unpersuasive.

¶ 73    It bears repeating that Florey is the named trustee over Kyle's Trust. As such, he is held to a high standard and holds a position of trust. That the agreement might bind future third parties, new shareholders, or the parties' successors or assigns has no bearing on Florey's present duties and obligations as trustee.

¶ 74    Here, the settlement agreement provided that each beneficiary and the "beneficiary's trustees" would release "any and all" claims against the other beneficiaries, Tempco, and the executor. This provision directly conflicts with the duties of a trustee as outlined in section 4.11 of the Act, which provides that a trustee has the duty to "compromise, contest, prosecute or abandon claims or other charges in favor of or against the trust estate." 760 ILCS 5/4.11 (West 2018).[9] As such, we fail to see how the release provisions in the settlement agreement do not impact Florey and his ability to carry out his duties as a trustee. The shareholders' agreement also included a "Restriction of Transfer" section, which provided that a shareholder cannot sell or transfer any stock for five years from the date of the agreement. This provision also restricts Florey's ability to manage the assets of Kyle's Trust.

¶ 75    Lastly, we note that Florey's participation in the settlement agreement was necessary to protect Kyle's interest. Although the record shows that the underlying settlement agreement was negotiated with the benefit of counsel and that Kyle signed the documents, respondents contend that "one of the purposes of Decedent in creating Kyle's Trust" was "to protect against Kyle's mismanagement of his shares of the Tempco stock and the [Properties]." According to respondents, this intent was evidenced by a provision in Decedent's Trust providing that Kyle may only withdraw from the principal of his shares after reaching the age of 25. Accordingly, respondents argue that by enforcing the settlement agreement without Florey's agreement, the circuit court essentially allowed Kyle to manage and make decisions with respect to the trust property before reaching the age of 25, thus, nullifying the purpose of the trust provisions. We agree.

¶ 76    Citing our supreme court's decision in *Wayman v. Follansbee*, 253 Ill. 602, 613-16 (1912), respondents contend that such provisions can be interpreted as the creator's intent to prevent mismanagement of the shares. In *Wayman*, the testator's will included a provision directing the trustee to pay his grandson a sum of $75 at the end of each month until he reached the age of 16 years; the payment would then increase to $100 until the grandson reached the age of 25 years. *Id.* at 606. These payments were subject to the discretion of the trustee and were to be " 'used, as far as necessary, in [the grandson's] support and education.' " *Id.* However, " '[n]one of said payments [were to] continue after [the grandson] attained the age of twenty-five years.' " *Id.* The court held that it is "perfectly plain that one of purposes of the testator in creating the trust was to provide against the possible mismanagement of the shares of the

---

[9]Section 811 of the new Code, entitled "Enforcement and defense of claims," also provides that "[a] trustee shall take reasonable steps to enforce claims of the trust and to defend claims against the trust." 760 ILCS 3/811 (West Supp. 2019).

grandchildren until they attained the age of twenty-five years." *Id.* at 616. The court noted that, "[w]hile the testator made suitable provision for his grandchildren until they attained the age of twenty-five years, still, for reasons which he deemed sufficient, he expressly provided that their shares should continue in the trust until they reached the required age." *Id.*

¶ 77        *Wayman* is analogous to the present case. Here, the agreement provides that the trustee shall pay Kyle income "in convenient installments, at least quarterly" during his lifetime or until there is complete distribution. Florey also had the discretion to pay to or on behalf of Kyle "such sums from the principal of his share as the trustee deems necessary or advisable from time to time for [Kyle's] health, maintenance in reasonable comfort *** [and] best interest." Kyle could only withdraw "any part" of the principal of his shares at any time after reaching the age of 25, and such withdrawal could "not exceed in the aggregate 1/2 in value thereof prior to reaching the age of 30 years." These provisions plainly demonstrate that one of decedent's purposes in creating Kyle's Trust was to provide against mismanagement of shares and property. Additionally, "[t]he fact that a trustee was appointed and vested with the estate and the beneficiary was given the income only is a circumstance from which the intention of the testator to create a spendthrift trust may be inferred." *Bennett v. Bennett*, 217 Ill. 434, 442-43 (1905); see also *Geiger v. Geer*, 395 Ill. 367, 376 (1946) (providing that a "spendthrift trust is created with a view of providing a fund for the maintenance of another and at the same time securing it against his own improvidence or incapacity" (internal quotation marks omitted)). As such, we find that decedent's intent, based on the plain language, was to prevent mismanagement of the assets and, therefore, Florey was a necessary party to the settlement agreement.

¶ 78        In sum, we find that the circuit court erred in granting the motion to enforce settlement where it was not signed by Florey, whom we deem a necessary party to the agreement.

¶ 79                                        III. CONCLUSION
¶ 80        For the reasons stated, we reverse the judgment of the circuit court of Cook County.

¶ 81        Reversed.